PD-0832-15

PD-0832-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/2/2015 5:05:43 PM
Accepted 7/2/2015 5:15:55 PM
ABEL ACOSTA
CLERK

No. 14-13-00662-CR

## IN THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

July 2, 2015

ABEL ACOSTA, CLERK

JAMES ALLEN JENKINS,

Appellant,

v.

THE STATE OF TEXAS,

Appellee.

On Appeal From the 359th Judicial District Court
Of Montgomery County Texas

## STATE'S PETITION FOR DISCRETIONARY REVIEW

KEN PAXTON
Attorney General of Texas

JONATHAN WHITE
Assistant Attorney General

ADRIENNE MCFARLAND
Chief, Criminal
Prosecutions Division

*JON R. MEADOR
Assistant Attorney General
State Bar No. 24039051

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

*Lead Appellate Counsel    jon.meador@texasattorneygeneral.gov

ATTORNEYS FOR THE STATE

ORAL ARGUMENT IS REQUESTED

# IDENTITY OF JUDGE, PARTIES, AND COUNSEL

**JUDGE:**  Honorable John Stevens
359th District Court
Montgomery County, Texas

**PROSECUTORS:**  Jonathan White & David Glickler
Office of the Attorney General
Assistant Attorney Generals
P.O.12548
Austin, Texas 78711

**DEFENSE ATTORNEY:**  Audley Heath
609 Colquitt Street
Houston, Texas 77006

**APPELLATE ATTORNEYS:**  George McCall Secrest, Jr. (Appellant)
Bennett & Secrest, PLLC
808 Travis Street, 24th Floor
Houston, Texas 77002

Jon R. Meador
Office of the Attorney General
Assistant Attorney Generals
P.O.12548
Austin, Texas 78711

# TABLE OF CONTENTS

IDENTITY OF JUDGE, PARTIES, AND COUNSEL ........................i

TABLE OF CONTENTS................................................................ ......ii

TABLE OF AUTHORITIES ................................................. ......iii

STATEMENT REGARDING ORAL ARGUMENT ................................ 1

STATEMENT OF THE CASE ................................................................ 2

STATEMENT OF THE PROCEDURAL HISTORY .............................. 2

GROUNDS FOR REVIEW ................................................................... 2

REASONS FOR REVIEW ..................................................................... 3

ARGUMENT AND AUTHORITIES ...................................................... 4

    1.    The Court of Appeals Erred in Failing to Affirm the Trial Court's Ruling Denying Appellant's Request for a Section 8.03 Mistake of Law Instruction. ........................................................................ 4

        a.    The Court of Appeals Erroneously Relied on the Dictum Appearing in *Juarez* to the Effect that Section 8.02 Mistake of Fact was an Affirmative Defense. .......................................................... 6

        b.    The Court of Appeals Compounded the Error by Finding that Section 8.03 Mistake of Law Could Be Used to Negate the Defendant's Mental State. ................................................................. 9

        c.    The Court of Appeals Erred in Determining that Section 64.012 of the Election Code Was Not Immune from a Mistake-Related Defense. ......................................................................... 12

        d.    Appellant's Reliance Was Unreasonable as a Matter of Law. . 14

    2.    The Court of Appeals Erred in Finding that Appellant Was Harmed by the Trial Court's Failure to Provide a Section 8.03 Mistake of Law Instruction. ..................................................................... 15

CONCLUSION ................................................................................... 18

PRAYER FOR RELIEF ...................................................................... 18

CERTIFICATE OF COMPLIANCE WITH

TEXAS RULE OF APPELLATE PROCEDURE 9.4 ............................ 20

CERTIFICATE OF SERVICE.................................................................................. 21

APPENDIX (Opinion of the Court of Appeals)

# TABLE OF AUTHORITIES

**Cases**

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985)....................16

*Bryan v. United States*, 524 U.S. 184 (1998)...............................13

*Cornet v. State*, 417 S.W.3d 446 (Tex. Crim. App. 2013) ...................15

*Davis v. United States*, 690 F.3d 330 (5th Cir. 2012).....................15

*Edwards v. Kaye*, 9 S.W.3d 314 (Tex. App. – Houston [14th Dist.] 1999, pet. denied) ...............................................................7

*Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998).................9

*Granger v. State*, 3 S.W.3d 36 (Tex. Crim. App. 1999)...................7,8

*Green v. State*, 829 S.W. 2d 222 (Tex. Crim. App. 1992) ...............14,15

*Jackson v. State*, 646 S.W.2d 225 (Tex. Crim. App. 1983) ...............7,8

*Juarez v. State*, 308 S.W.2d 398 (Tex. Crim. App. 2010) ...............3, 6, 9

*Kimbro v. State*, 157 Tex. Crim. R. 438, 440, 249 S.W.2d 919 (1952) .....9

*Lowry v. State*, 692 S.W.2d 86 (Tex. Crim. App. 1985).....................8

*Medrano v. State*, 421 S.W. 3d 869 (Tex. App.—Dallas 2014, pet. ref'd) .................................................................12,13,14

*Osterberg v. Peca*, 12 S.W.3d 31 (Tex. 2000)..............................13

*Sanchez v. State*, 376 S.W.3d 767 (Tex. Crim. App. 2012).................15

*Slott v. State*, 148 S.W.3d 624 (Tex. App. – Houston [14th Dist.] 2004, pet. ref'd)..............................13

*Thompson v. State*, 26 Tex. App. 94, 97 S.W. 486 (1888)..................13

*Willis v. State*, 790 S.W. 307 3141 (Tex. Crim. App. 1990)................9

**Statutes**

Tex. Elec. Code Ann. § 1.015 (West 2010) ...............................4, 15

Tex. Elec. Code Ann. § 64.012 (West 2010) ............................ 4, 12, 14, 15

Tex. Elec. Code Ann. §11.001 (West 2010) .................................................4

Tex. Penal Code § 2.04 (West 2010).........................................................8

Tex. Penal Code Ann. § 2.03 (West 2010)...............................................14

Tex. Penal Code Ann. § 8.02 (West 2010)...............................................6, 8

Tex. Penal Code Ann. § 8.03 (West 2010)....................................... passim

Tex. R. App. Proc. 66.3 ..............................................................................3, 4

Tex. R. App. Proc. 9.4 ...............................................................................20

## Other Authorities

Wayne R. LaFave, *Substantive Criminal Law*,

    § 5.6(a), at 394-395 (2d ed. 2003). ..............................................10, 11

No. 14-13-00662-CR

---

IN THE COURT OF CRIMINAL APPEALS
OF THE STATE OF TEXAS

---

JAMES ALLEN JENKINS,

Appellant,

v.

THE STATE OF TEXAS,

Appellee.

## STATE'S PETITION FOR DISCRETIONARY REVIEW

## TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through the Office of the Attorney General, and respectfully urges this Court to grant discretionary review of the above named cause, pursuant to the rules of appellate procedure.

## STATEMENT REGARDING ORAL ARGUMENT

Because this Court would be addressing an issue of first impression and given the confusion regarding the application of the statutory affirmative defense of mistake of law, the State respectfully requests oral argument.

1

## STATEMENT OF THE CASE

Appellant was convicted of illegal voting. Appellant claimed on appeal that the trial court erred in failing to provide a statutory mistake of law instruction pursuant to section 8.03 of the Penal Code (Section 8.03 Mistake of Law). A majority of the court of appeals found that the trial court erred in failing to provide the instruction and that the error harmed the Appellant. The dissent found no error and no harm.

## STATEMENT OF THE PROCEDURAL HISTORY

On June 4, 2015, the court of appeals reversed Appellant's conviction in a published opinion. *See Jenkins v. State*, __ S.W.3d __, No. 14-13-00662-CR, 2015 Tex. App. LEXIS 5667 (Tex. App. – Houston [14th Dist.] June 4, 2015). The State's petition is due Monday, July 6, 2015.

## GROUNDS FOR REVIEW

1. Did the court of appeals err in failing to affirm the trial court's ruling denying Appellant's section 8.03 mistake of law instruction. *See* IX RR 169 (trial court's ruling).[1]

---

[1] "RR" refers to the statement of facts of the jury trial in the Reporter's Record, preceded by the volume number and followed by the page number. "CR" refers to the Clerk's Record of papers filed in the trial court and followed by the page number.

2

2.	Did the court of appeals err in finding that Appellant was harmed by the trial court's failure to provide a section 8.03. *See Jenkins*, 2015 Tex. App. LEXIS 5667, at **63-68.

## REASONS FOR REVIEW

1.	By finding that Section 8.03 Mistake of Law is not subject to confession and avoidance, the court of appeals has decided an important question of state or federal law that has not been, but should be, settled by the Court of Criminal Appeals. *See* Tex. R. App. Proc. 66.3 (b).

2.	By finding that Section 8.03 Mistake of Law is not subject to confession and avoidance, the court of appeals has decided an important question of state or federal law that conflicts with applicable decisions of the Court of Criminal Appeals. *See* Tex. R. App. Proc. 66.3(c).

3.	By supporting its holding that Section 8.03 Mistake of Law is not subject to confession and avoidance, the court of appeals relied on a statement in *Juarez v. State*, 308 S.W.2d 398 (Tex. Crim. App. 2010) that conflicts with other decisions of the Court of Criminal Appeals. *See* Tex. R. App. Proc. 66.3(c).

4.	By finding that Section 8.03 Mistake of Law is not subject to confession and avoidance, the court of appeals has misconstrued a statute. *See* Tex. R. App. Proc. 66.3(d).

5.	By finding that the offense of illegal voting "incorporates knowledge of the law or legal concepts" the court of appeals has decided an important question of state or federal law that conflicts with applicable decisions of the Court of Criminal Appeals. *See* Tex. R. App. Proc. 66.3(c).

6.	By finding that the offense of illegal voting is not immune from a mistake-related defense, the court of appeals has decided an important question of state or federal law that conflicts with

3

applicable decisions of the Court of Criminal Appeals. *See* Tex. R. App. Proc. 66.3(c).

7.  By focusing its harm analysis almost exclusively on the arguments of counsel, the court of appeals has so far departed from the accepted and usual course of judicial proceedings as to call for an exercise of the Court of Criminal Appeals' power of supervision. *See* Tex. R. App. Proc. 66.3(f).

8.  The justices of the court of appeals have disagreed on material questions of law necessary to the court's decision. *See* Tex. R. App. Proc. 66.3(e).

## ARGUMENT AND AUTHORITIES

1.  **The Court of Appeals Erred in Failing to Affirm the Trial Court's Ruling Denying Appellant's Request for a Section 8.03 Mistake of Law Instruction.**

Appellant was charged with illegal voting, which is defined as voting "knowing that he [was] not eligible to vote." *See Jenkins*, 2015 Tex. App. LEXIS 5667, at **12-13; *see* Tex. Elec. Code Ann. § 64.012 (West 2010) (Section 64.012).[2] Appellant testified and claimed that he believed he was a resident of the RUD when he voted. *See Jenkins*, 2015 Tex. App. LEXIS 5667, at *35. At the charge conference, Appellant provided the trial court with a proposed instruction asking for a Section

---

[2] Eligibility is based on "residency" *See* Tex. Elec. Code Ann. §11.001(a)(2) (West 2010). And "residency" is defined as "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." *See* Tex. Elec. Code Ann § 1.015(a) (West 2010).

4

8.03 Mistake of Law instruction. *See id.* at \*\*71-72, 84-86; *see also* Tex. Penal Code Ann. § 8.03(b) (West 2010).[3] The trial court denied the request stating:

> Number one, as far as Section 8.03 is concerned, the defendant has flatly challenged throughout this trial that he committed the conduct charged. He has stood by his belief and his contention that he was eligible to vote. And that is one of the elements and that is being challenged. It is not an element that he is admitting to. And for that reason, the mistake of law defense is not going to be allowed.
>
> However, as this Court understands the theory of the defense case through its presentation and arguments, this mistake of law, that Mr. Heath is submitting, is actually intertwined in the challenge to the element that the State has to prove and that is that the defendant knew he was ineligible to vote. He voted in an election that he knew he was not eligible to vote. He's challenging that element and he will certainly be – he's entitled to do that. And that argument and presentation inherent within this proposed mistake of law this Court looks at is actually a challenge on the element of the offense. He's denying he committed the offense; and that is the battleground of this case is the

---

[3] (b). It is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon:

(1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

(2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Tex. Penal Code § 8.03 (West 2010).

5

defendant's – whether the State can prove beyond a reasonable doubt the defendant knew that he acted illegally in voting in the election.

IX RR 169.

Appellant raised two points of error on appeal: (1) the trial court erred in failing to give the requested Section 8.03 Mistake of Law instruction, and (2) section 1.015 of the Election Code was unconstitutionally vague. Appellee's Br. at 2. The court of appeals reversed and remanded on the first point of error and did not reach Appellant's second point of error. *See Jenkins*, 2015 Tex. App. LEXIS 5667, at **37-38.

### a. The Court of Appeals Erroneously Relied on the Dictum Appearing in *Juarez* to the Effect that Section 8.02 Mistake of Fact was an Affirmative Defense.

While this case involves a request for a *Section 8.03 Mistake of Law* instruction, one of the key errors made by the court of appeals was to rely on a statement this Court made in *Juarez v. State* to the effect that that *Section 8.02 Mistake of Fact* was an "affirmative defense." *See Jenkins*, 2015 Tex. App. LEXIS 5667, at **46. As noted above, the trial court denied Appellant's Section 8.03 Mistake of Law instruction on two grounds: (1) Section 8.03 Mistake of Law was an affirmative defense

6

subject to confession and avoidance; and, (2) Appellant was not entitled to an instruction because his defensive theory was merely an attempt to negate an element of the crime. Because there is no dispute that the doctrine of confession and avoidance does not apply "when the defensive issue, by its terms, negates the culpable mental state," the court of appeals had to find an "affirmative defense" that "by its terms" negated the culpable mental state. Based on this Court's inadvertent reference to Section 8.02 Mistake of Fact as an "affirmative defense," the court of appeals thought that it had located an "affirmative defense" that "by its terms" negated the culpable mental state. The trial court's ruling that Appellant was not entitled to a restriction because affirmative defenses fall under the doctrine of confession and avoidance. Now appears to be suspect. But the statement in *Juarez* was clearly dictum.[4] *See Juarez*, 308 S.W.3d at 402. In citing Section 8.02 Mistake of Fact as an "example" of an "affirmative defense," this Court cited *Granger v. State*, 3 S.W.3d 36, 41 (Tex. Crim. App. 1999) and *Jackson v. State*, 646

---

[4] *See Edwards v. Kaye,* 9 S.W.3d 310, 314 (Tex. App. – Houston [14th Dist.] 1999, pet. denied) ("Dictum is an observation or remark made concerning some rule, principle, or application of law suggested in a particular case, which observation or remark is not necessary to the determination of the case.") (quoting BLACK'S LAW DICTIONARY 409 5th ed. (1979)).

S.W.2d 225, 227 (Tex. Crim. App. 1983). *See id.* at 402. While both *Granger* and *Jackson* involved a Section 8.02 Mistake of Fact instruction, neither case holds or says that it is an "affirmative defense." This Court in both cases used phrases like "an affirmative mistake of fact instruction" or "an affirmative instruction on mistake of fact" *see Granger,* 3 S.W.3d at 37, 38, or "an affirmative charge on a defensive issue" or "an affirmative submission of a defensive charge" *see Jackson,* 646 S.W.2d at 225, but nowhere does the Court hold that a Section 8.02 Mistake of Fact instruction is an "affirmative defense." The Court simply appears to be stating that if the defendant has affirmatively raised a defensive issue, he should receive a defensive instruction. Otherwise, there are clear due process concerns if Section 8.02 Mistake of Fact is now an "affirmative defense." *See* Tex. Penal Code § 2.04(d) (defendant has burden of proof); *Lowry v. State,* 692 S.W.2d 86, 87 (Tex. Crim. App. 1985) (cannot shift burden of proof to defendant to prove state of mind). Clearly, this Court did not mean to transform Section 8.02 Mistake of Fact into an "affirmative defense" and has long recognized that "only the legislature can establish defenses and affirmative defenses to criminal offenses and [] only those

8

defenses and affirmative defenses entitle defendants to defensive and affirmative defensive instructions in jury charges." *See Giesberg v. State*, 984 S.W.2d 245, 249-250 (Tex. Crim. App. 1998) (citing *Willis v. State*, 790 S.W. 307 3141 (Tex. Crim. App. 1990), 790 S.W.2d at 314).

The long-held belief that "[a]t the foundation of every affirmative defense is the practical, if not technical, necessity of the defendant acknowledging he committed the otherwise illegal conduct" was unaffected by *Juarez*. In fact, this Court in discussing the historical roots of the confession and avoidance doctrine in *Juarez* noted that "'an affirmative defense was defined, in part, as meaning a new matter, *assuming the complaint to be true*, which constitutes a defense to it." *See* 308 S.W.3d at 402-403 (citing *Kimbro v. State*, 157 Tex. Crim. R. 438, 440, 249 S.W.2d 919 (1952)) (emphasis in orig.). In short, the court of appeals erred in relying on *Juarez* to undermine the trial court's ruling.

> **b.** **The Court of Appeals Compounded the Error by Finding that Section 8.03 Mistake of Law Could Be Used to Negate the Defendant's Mental State.**

In order to find error in the trial court's ruling, the court of appeals also had to show that the purpose of a Section 8.03 Mistake of

9

Law defense was to negate the mental state that the defendant must have to be guilty of the offense. The majority concluded that the legislature intended Section 8.03 Mistake of Law to apply "when a charged offense includes, as an element of the crime, a culpable mental state that incorporates knowledge of the law or legal concepts." *See Jenkins,* 2015 Tex. App. LEXIS 5667, at *48. The majority also noted what it believed to be an incongruity in its application if entitlement to a Section 8.03 Mistake of Law instruction first required a confession. *See id.* at *49.

As the dissent pointed out, the majority has confused a failure-of-proof defense that does nothing more negate an element of the offense, like the mental state required to prove the offense charge, with a justification or excuse-type defense that is in the nature of confession and avoidance, as codified in Section 8.03 Mistake of Law. *See id.* at *74 (citing Wayne R. LaFave, *Substantive Criminal Law*, § 5.6(a), at 394-395 (2d ed. 2003). Here, because Appellant denied committing the offense, a mistake of law "defense" was nothing more than a denial of the charged offense: he made a good-faith mistake. *See id.* at *75 ("'[i]nstead of speaking of ignorance or mistake of fact or law as a

10

defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law for the commission of that particular offense.'") (citing LaFave, *Substantive Criminal Law § 5.6(a)*, at 395)). Section 8.03 Mistake of Law is the second type of defense that seeks to *excuse* what would otherwise by criminal and is in the nature of confession and avoidance. *See Jenkins*, 2015 Tex. App. 5667, at **75-76.

As for the second point, the dissent pointed out that regardless of whether Section 8.03 Mistake of Law as written was subject to confession and avoidance, the pattern jury charge Appellant provided the trial court was in the nature of confession and avoidance. *See id.* at **84-86 & n.5. Appellant here was charged with voting in an election in which he "*knew he was not eligible to vote because he knew he did not reside in the precinct in which he voted.*" *Id.* at **71-72 (emphasis in orig.). The charge Appellant provided instructed the jury to consider "whether Appellant reasonably believed it was not a crime for him to vote when he *knew* he did not reside in the precinct in which he voted." *See id.* at **71-73, 84 (emphasis in orig.). Appellant, then, provided an instruction that assumed he "knew he was not a resident" in reliance

11

various election-law authorities. *See id.* Appellant wanted an instruction that allowed for an acquittal if it could be shown that he believed he was a resident of the RUD when he voted. *See id.* The instruction he provided did not provide the jury with that option. As the trial court correctly pointed out, the reasonable-doubt instruction did.

c. **The Court of Appeals Erred in Determining that Section 64.012 of the Election Code Was Not Immune from a Mistake-Related Defense.**

Part – if not all – of the confusion surrounding the application of Section 8.03 Mistake of Law in this case concerns the way in which this offense is defined. A person commits the offense of illegal voting "if the person votes . . . in an election in which the person knows the person is not eligible to vote." *See* Tex. Elec. Code § 64.012(a)(1). The majority believed that the offense "incorporates knowledge of the law or legal concepts" and that "Jenkins's knowledge of where he resided turned on his understanding of the legal requirements for residence under the election code." *See Jenkins*, 2015 Tex. App. LEXIS 5667, at \*\*48, 54. But it is well-settled that knowledge of the law is irrelevant in a prosecution for illegal voting because the statute uses the word "knowing." *See Medrano v. State*, 421 S.W. 3d 869, 884-885 (Tex. App.—

12

Dallas 2014, pet. ref'd) (citing *Thompson v. State*, 26 Tex. App. 94, 97 S.W. 486, 486 (1888) for proposition that State did not need to prove defendant subjectively knew she was not eligible to vote but only that she voted in election "she knew she was not a resident of the precinct for which she was voting"); *see also Bryan v. United States*, 524 U.S. 184, 193 (1998) ("[U]nless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.") *Osterberg v. Peca,* 12 S.W.3d 31, 38 (Tex. 2000) (no need to prove that defendant knew his conduct violated Election Code since term "knowingly" in Election Code refers only to person's knowledge of act and not to whether act violated Election Code); *Slott v. State*, 148 S.W.3d 624, 633 (Tex. App. – Houston [14th Dist.] 2004, pet. ref'd) (where statute uses word "knowingly," knowledge of law irrelevant). When the offense—and thus the application paragraph—requires proof of knowledge beyond a reasonable doubt, there is no reason to also instruct the jury that a reasonable doubt on the issue of knowledge requires acquittal. Tex. Penal Code Ann. § 2.03(d) (West 2010).

The dissent noted the apparent inapplicability of a mistake-related defense where the defendant simply argued that he committed some illegal act under a good-faith mistaken belief that he was not committing an offense. *See Jenkins*, 2015 Tex. App. LEXIS, at **80-81 (citations omitted). Given the wording of Section 64.012, the State had no obligation to prove that Appellant knew he was violating that Election Code but only had to prove certain basic facts. The jury, then, was asked to provide the law to the facts to determine whether he knew he was a resident. In short, the statute is immune from a mistake-related defense.

### d. Appellant's Reliance Was Unreasonable as a Matter of Law.

This Court has noted that reliance may be unreasonable "as a matter of law." *See Green v. State*, 829 S.W. 2d 222, 223 (Tex. Crim. App. 1992) (citing to Section 8.03 Mistake of Law). Section 8.03 Mistake of Law explicitly requires that the defendant's belief is a "reasonable" one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *See* Tex. Penal Code. § 8.03(b); *see id.* § 1.07(42) (defining "reasonable belief"). Consequently, the law examines "reasonableness" from the perspective of an ordinary and prudent

14

person. The authorities Appellant relied on do not excuse Appellant's non-compliance with Section 64.012 or justify his conduct. There must be some reasonable and rational relationship between Appellant's conduct and the authorities on which he allegedly relied upon in excusing his conduct. *See Green*, 829 S.W.2d at 223; *Davis v. United States*, 690 F.3d 330, 341 (5th Cir. 2012) (reliance unreasonable under Section 8.03 Mistake of Law if based on factually dissimilar decisions). By law, a temporary stay in a hotel is insufficient to establish residency. *See* Tex. Elec. Code Ann. § 1.015(a). Appellant's reliance on factually dissimilar opinions was unreasonable as a matter of law.

**2. The Court of Appeals Erred in Finding that Appellant Was Harmed by the Trial Court's Failure to Provide a Section 8.03 Mistake of Law Instruction.**

The court of appeals erred in finding that the omission of the Section 8.03 Mistake of Law instruction was harmful. The failure to provide a properly requested defensive instruction must result in actual not theoretical harm. *See Cornet v. State*, 417 S.W.3d 446, 449-450 (Tex. Crim. App. 2013) (citing *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (requiring actual harm and not just theoretical harm). A reviewing court must evaluate the entire record including (1)

15

the entire jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

The court of appeals ignored three of the four relevant factors in determining whether there was harm in the failure to provide a Section 8.03 Mistake of Law instruction and focused exclusively on the arguments of counsel. *See Jenkins,* 2015 Tex. App. LEXIS 5667, at **63-68. First, given the charge the jury was provided, it would have been impossible for the jury to have found Appellant guilty beyond a reasonable doubt without having first considered whether he mistakenly believed he was a resident of the RUD. The dissent stated it this way:

> [B]ecause the jury could not find both that appellant knew he was not a resident but had a reasonable belief he was a resident, the knowing requirement in the charge fulfills the same function as the reasonable belief defense: giving the jury a vehicle to find appellant not guilty if he thought he was a resident in reliance on the authorities.

*Id.* at **93-94.

16

Second, the state of the evidence weighed heavily against Appellant. The jury heard that Appellant conspired to "overthrow a utility" with nine other people who all believed, at Appellant's direction, that they could all change their addresses to a hotel, then vote one time in an election. *See Jenkins,* 2015 Tex. App. LEXIS 5667, at **9-12. There was no good-faith mistaken belief about residency. Third, Appellant's arguments and the State's arguments were made as if Appellant had received a Section 8.03 instruction and both parties told the jury to read the opinions Appellant relied on. *See* IX RR 179-208. Appellant was also able to make an argument that he would not have been able to make if he were confined to Section 8.03; namely, "He talked with a lawyer who understood the election process and got advice from him concerning how do you establish residency for voting purposes." IX RR 199. Fourth and significantly, Appellant was able to make a Section 8.03 Mistake of Law argument without having to prove his defensive theory by a preponderance of the evidence. Last, it is very likely that the jury would have been confused with the provision of the Section 8.03 Mistake of Law instruction falling after the reasonable-doubt instruction. *See Jenkins,* 2015 Tex. App. LEXIS 5667, at **91-92.

17

Appellant was not harmed by the omission of the Section 8.03 Mistake of Law instruction.

## CONCLUSION

The court of appeals erred in failing to affirm the trial court's ruling denying Appellant's Section 8.03 Mistake of Law instruction. This Court should grant the State's petition for discretionary review (1) to correct or explain this Court's statement in *Juarez* to the effect that Section 8.02 Mistake of Fact is an "affirmative defense"; (2) to address whether Section 8.03 Mistake of Law, as written and as denominated by the Texas Legislature as a statutory "affirmative defense," is subject to the doctrine of confession and avoidance; (3) to give trial courts guidance on when and how to provide a Section 8.03 Mistake of Law instruction; (4) to demarcate the boundaries of reliance; and, (5) to address whether another non-Penal Code offense using a mental state like "knowing" is immune from a mistake-related defense. The court of appeals also erred in finding that the failure to provide the Section 8.03 Mistake of Law instruction was not harmless.

## PRAYER FOR RELIEF

18

FOR ALL THESE REASONS, the State respectfully requests that this Honorable Court grant this petition for discretionary review, reverse the court of appeals and remand this case to the court of appeals to address Appellant's second point of error.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal Justice

JONATHAN WHITE
Assistant Attorney General
Criminal Prosecutions Division

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*Lead Counsel

/s/ Jon R. Meador
JON R. MEADOR*
Assistant Attorney General
Criminal Appeals Division
State Bar No. 24039051

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (FAX)

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF COMPLIANCE WITH
## TEXAS RULE OF APPELLATE PROCEDURE 9.4

I do hereby certify that this brief complies with Tex. R. App. Proc. 9.4 in that it contains 3,651 words, in Microsoft Word 14.0, Century, 14 points.

/s/ Jon R. Meador
JON R. MEADOR
Assistant Attorney General

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing pleading is served by electronic filing, by email, and by placing the same in the United States Mail, postage prepaid, on this the 2nd day of July 2015, addressed to:

George McCall Secrest, Jr.
Bennett & Secrest, LLP
808 Travis, 24th Floor
Houston, Texas 77002-4177
gmsecrest@aol.com

Lisa C. McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
512/463-1660 (Telephone)
512/463-5724 (Fax)

/s/ Jon R. Meador
JON R. MEADOR
Assistant Attorney General

21

# APPENDIX



In The

# Fourteenth Court of Appeals

### NO. 14-13-00662-CR

### JAMES ALAN JENKINS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 359th District Court
Montgomery County, Texas
Trial Court Cause No. 12-03-02579-CR**

## MAJORITY OPINION

A jury convicted appellant James Alan Jenkins of illegally voting in an election in which he knew he was not eligible to vote. Jenkins was sentenced to three years' confinement in the Texas Department of Criminal Justice and ordered to pay a $10,000 fine. Jenkins contends that the trial court erred by refusing to instruct the jury on the defense of mistake of law. Jenkins also contends that section 1.015 of the Election Code is unconstitutionally vague as applied to him.

Because we conclude that Jenkins was entitled to a jury instruction on the statutory defense of mistake of law, we reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an election held on May 8, 2010, for members of the Board of Directors of the Woodlands Road Utility District No. 1 in Montgomery County, Texas (the "RUD"). The RUD was created to provide for the construction and maintenance of roadways in and around the Woodlands. The RUD's boundaries encompass primarily commercial properties that pay property taxes used to fund the RUD's projects.

### 1. Events leading up to the trial

Adrian Heath, a politically active resident of Montgomery County and a long-time friend of Jenkins, learned of the RUD's existence sometime in 2009 while researching issues of local government debt. Heath did not reside in the RUD. He did, however, regularly use the roads and frequent the businesses located in the RUD.

Heath learned that the RUD was formed in 1991 and was governed by a board of five directors who were appointed and then confirmed by an initial election in 1992. Heath became concerned when he discovered that regularly contested elections for board members had not been held since 1992.[1] Heath believed that the RUD's board acted primarily to benefit the Woodlands Development Company, the developer of the Woodlands, rather than the interests of the local residents.

Heath learned that three of the RUD directors' terms would expire in 2010,

---

[1] The record reflects that three of the RUD's directors are elected in even-numbered years, and two are elected in odd-numbered years; if no positions are contested, no election is required to be held.

2

so he researched the residency requirements for voting and investigated whether there were registered voters residing in the RUD. As part of his research, Heath contacted state and local election officials and others, reviewed documents, and consulted an attorney. Armed with what he had learned, Heath sought to raise awareness about the RUD through various media outlets. He made presentations to groups and actively encouraged people to run against the incumbent RUD directors. Heath also shared what he had learned with Jenkins.

For nearly twenty years, Jenkins had lived with his family at 16 Pastoral Pond Circle in the Woodlands, which is not within the RUD. But, he used the roads and engaged in activities within the RUD. Jenkins was politically active but had been unaware of the RUD's existence. Jenkins's political activities included regularly attending political meetings and, at one point, running unsuccessfully for a county political party chairmanship. Before moving to the Woodlands, Jenkins served as a city councilmember of West University Place. Jenkins had also earned a master's degree in laser physics and was the owner of World Wide Microsystems, Inc., a company that designs, manufactures, and sells control equipment for industry.

In late February or early March, Heath asked Jenkins to invite a group of people to attend a meeting concerning the RUD at a public library in the Woodlands. Jenkins invited Richard McDuffee, Peter J. Goeddertz, Bill Berntsen, and Jim Doyle, all of whom attended the meeting, along with Jenkins and a few other people. At the meeting, Heath gave a presentation about the structure of the RUD, the lack of contested elections for members of the RUD's board of directors, and his understanding of the requirements for establishing a residency for voting purposes in Texas. He also provided copies of a map of the RUD and a formal

election law advisory opinion of the Texas Secretary of State.[2] The January 22, 2004 opinion, titled Election Law Opinion GSC-1, addressed the application of Texas residency requirements to college students attending Prairie View A&M University (the "Secretary of State opinion").

The Secretary of State opinion set out in full the Texas Election Code statutes governing voter eligibility and qualifications, and included the Election Code's definition of "residence" as follows:

§ 1.015. Residence

(a)    In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b)    Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

TEX. ELEC. CODE ANN. § 1.015 (Vernon 2003).

The Secretary of State opinion also included a discussion of applicable federal and state case law, including *Mills v. Bartlett*, 377 S.W.2d 636 (Tex. 1964), which was cited for the following statements concerning a voter's residence:

---

[2] The Secretary of State is the chief election officer of Texas. *See* Tex. Elec. Code § 31.001(a).

4

> The meaning that must be given to [the term 'residence'] depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Volition, intention, and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile.
>
> . . .
>
> Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. *There is no specific length of time for the bodily presence to continue.*

*Mills*, at 637 (emphasis added).

The Secretary of State opinion concluded by noting that "[t]hese principles apply equally to college students as well as other voters, and no more can be required of them in order for them to register and vote in the State of Texas."

After the meeting, Jenkins further investigated the RUD's operations. Jenkins was concerned that although the RUD's activities affected everyone in the Woodlands, the residents had no input into its activities. Jenkins continued to meet with McDuffee, Goeddertz, Berntsen, and others about placing challengers on the ballot and encouraging people to change their residences to vote in the upcoming election. Some of the meetings were held at Jenkins's business office. Ultimately, McDuffee, Goeddertz, and Berntsen agreed to run against the incumbent directors. They each completed applications for places on the ballot, listing their home addresses, which were not inside the RUD, as their permanent residences.[3]

Jenkins had been registered to vote from his residence at 16 Pastoral Pond Circle, which was not within the RUD, for about eighteen years. On April 5, 2010,

---

[3] Although candidates for election to the RUD's board of directors were not required to be residents of the RUD, individuals who wanted to vote in a RUD election were required to reside in the district.

however, Jenkins signed a Texas Voter Registration application changing his residence address to 9333 Six Pines Drive, which was the address of a Marriott Residence Inn located within the RUD. On the form, Jenkins listed 16 Pastoral Pond Circle as his mailing address.

Heath, Berntsen, McDuffee, and Goeddertz similarly changed their voter registration addresses to the hotel address, as did five others: Sybil Doyle and her daughter Roberta Cook, Thomas Curry, and brothers Benjamin and Robert Allison. As of the dates each of these people signed their voter registration applications, none of them had stayed at the Residence Inn at any time in 2010.

County deed records showed that Jenkins and the others owned homes outside the RUD boundaries, except for Benjamin and Robert Allison. The Allison brothers lived in their father's home, which was also outside the boundaries of the RUD. Additionally, Montgomery County Appraisal District records showed that in 1993, Jenkins had applied for, received, and had never withdrawn the homestead exemption he received for his home at 16 Pastoral Pond Circle. Doyle, Goeddertz, Cook, McDuffee, Curry, Heath, Berntsen, and the Allison brothers' father likewise maintained homestead exemptions for their homes.

RUD representatives became aware that several individuals had registered to vote using the address of a hotel in the RUD, and they asked the Montgomery County District Attorney's Office to intervene. On April 21, 2010, First Assistant District Attorney Phil Grant sent Jenkins and most of the others a letter informing them that the district attorney's office had received an official complaint alleging fraudulent voter registrations within the RUD for the upcoming May 8, 2010 election (the "Grant letter"). The Grant letter reflected that it was being sent to all voters registered in the RUD "for informational purposes only," and encouraged recipients with concerns about the legitimacy of their current voter registration to

6

seek the advice of counsel.

The Grant letter identified "[s]ome helpful resources for review," including the same Secretary of State opinion Heath had previously distributed, and Attorney General Opinion Number GA-0141, dated February 4, 2004 (the "Attorney General opinion"). Like the Secretary of State opinion, the Attorney General opinion was a response to an official inquiry into voter eligibility and residency requirements applicable to students attending Prairie View A&M University. It also cited *Mills* and other authorities, explaining:

> Under current law, the determination regarding "residence" thus involves both physical residence and current intention of the applicant; if a student, like any other applicant, satisfies the requirements of section 1.015, that student is a "resident" of the county in which the seeks to register. The intention of the voter registration applicant is crucial to a proper determination of residence, and every person is strongly presumed to have "the right and privilege of fixing his residence according to his own desires." *McBeth* [*v. Streib*, 96 S.W.2d 992, 995 (Tex. Civ. App.—San Antonio 1936, no writ)]. . . .

Recipients of the Grant letter were advised that they should "be aware that the elections code provides criminal penalties for knowing voting violations." As an example, the Grant letter included the text of section 64.012 of the Texas Election Code, specifying the elements of the offense of illegal voting. However, the Grant letter did not include the statutory requirements for voter eligibility or residency. Finally, the Grant letter encouraged each recipient to "exercise your right to vote in a manner that is consistent with the law."

After receiving the Grant letter, Jenkins sought advice from local attorney and long-time acquaintance Eric Yollick. Together, Jenkins and Yollick reviewed the Grant letter, the election code statutes, and the Secretary of State and Attorney General opinions. Jenkins also reviewed case law, including *Mills*. Additionally,

7

Jenkins discussed the Grant letter with Heath and the others, some of whom also consulted with Yollick before voting in the May 8, 2010 election.

On May 7, 2010, the day before the election, Jenkins checked into the Residence Inn at 9333 Six Pines Drive for a two-night stay. The Residence Inn's records noted that in addition to Jenkins, there would be four other guests in the room: McDuffee, Goeddertz, Heath, and Curry, although McDuffee spent only a few minutes in the hotel to change clothes and did not stay overnight. The hotel's records also showed that Curry had separately registered for a single night's stay on May 7, departing on May 8. Benjamin and Robert Allison also stayed overnight as guests before voting. Berntsen, Doyle, and Cook visited the group at the hotel, but did not stay overnight. Yollick also stopped by to visit with Jenkins at the hotel on the evening before the election.

The contested election took place on May 8. Early voting totals for the election showed that two people cast votes. Each of the incumbents received two votes, and no votes were cast for the challengers. On election day, however, ten voters cast votes for each of the three challengers. The ten voters were Jenkins, Heath, Berntsen, McDuffee, Goeddertz, Doyle, Cook, Curry, and the Allison brothers. Consequently, the challengers, Berntsen, McDuffee, and Goeddertz, received more votes than the incumbents.

A few days after the election, the incumbent RUD directors filed a lawsuit to challenge the election results. After meeting with some of the group of voters to discuss this development, Yollick agreed to represent Jenkins, Heath, McDuffee, Goeddertz, Berntsen, Curry, and the Allison brothers as intervenors in the lawsuit. After meeting with Yollick, some of the intervenors planned additional stays at the Residence Inn. Hotel records showed that Jenkins and three others stayed at the Residence Inn for one night on May 26, 2010; Jenkins also rented a room from

8

May 29 to June 14. While there, the intervenors took photographs of themselves working, relaxing, dining, and socializing at the Residence Inn. In some of the photographs, the intervenors held up documents or the front pages of newspapers. Yollick met with Jenkins and the others at the hotel several times; three of the meetings were specifically to discuss the lawsuit.[4] Jenkins also changed his driver's license address to the Residence Inn.

On March 8, 2012, Jenkins was indicted for the third-degree felony of illegal voting. The State alleged that Jenkins illegally voted in the May 8, 2010 Woodlands Road Utility District Board of Directors election "when he knew he did not reside in the precinct in which he voted." Jenkins pleaded "not guilty."

## 2. *The trial on guilt/innocence*

The guilt/innocence phase of the trial began on June 25, 2013. The State's theory was that Jenkins conspired with others to have his associates elected to the board of directors, take over the RUD, and shut it down. As part of the scheme, Jenkins and the others changed their voter registration addresses to the Residence Inn only to manipulate the outcome of the RUD election. The State argued that because Jenkins knowingly violating the election code in an attempt to cheat the system, he should be found guilty of illegal voting.

The defense countered that what Jenkins did was engage in the political process "to right what he perceived to be a wrong" within the confines of the law. The defense urged that it was fundamentally wrong to find an individual guilty of illegal voting by choosing their residence for voting purposes.

As the trial progressed, the defense focused primarily on the theory that

---

[4] The jury was not provided with any information concerning the details or the outcome of the civil lawsuit or subsequent appeal; however, that lawsuit ultimately was resolved against the intervenors. *See McDuffee v. Miller*, 327 S.W.3d 808 (Tex. App.—Beaumont 2010, no pet.).

Jenkins changed his residence for voting purposes based on his understanding of the law as expressed in the Secretary of State opinion, the Attorney General opinion, and *Mills*: that residence is determined by an intent to establish a residence combined with bodily presence, and there is no requirement that a person reside at that residence for any specific length of time. Jenkins argued that he reasonably relied on the two advisory opinions and the *Mills* case when he registered to vote and voted in the RUD election because he had both a physical presence and the intent to reside at the Residence Inn for voting purposes at the time he voted. Therefore, the defense maintained, Jenkins lacked the requisite intent to commit the offense of illegal voting.

The State's first witness was James Stilwell, the attorney who represented the incumbent RUD directors in the civil lawsuit. Stilwell provided factual background concerning the RUD and the May 8, 2010 election, explained some of the documents obtained from the trial in the civil suit, and discussed the testimony he elicited from Jenkins at that trial.[5]

Stilwell testified that Jenkins had said that the majority of his personal property was either at his house or at his business. On the night of May 7, when he checked into the Residence Inn, Jenkins took with him one or two suitcases, some toiletries, and some business papers. Jenkins also confirmed that four different individuals representing four families also stayed with him in his room on May 7. Jenkins admitted that he did not live in the hotel on the day he signed and swore on the voter's registration application that he did. Finally, Jenkins stated that one reason he decided to make the hotel his residence was that he had been trying to

---

[5] Stilwell also testified that as part of his investigation in the civil trial, he visited the home of the voters and found that they appeared to have the kinds of items one would normally find in an occupied home. He also took photographs of the properties, which were admitted into evidence in this trial.

sell his home at 16 Pastoral Pond Circle, citing a desire to downsize and a concern that his home was near a floodplain. Stilwell acknowledged that when he visited Jenkins's home during his investigation, he saw a "for sale" sign on the home, but as of the date of the civil trial, Jenkins still owned the home and declared it as his homestead. Stilwell conceded, however, that the election code does not require a person to reside at a location for any specific length of time to establish a residence for voting purposes.

The next witness was Phil Grant, the First Assistant District Attorney of Montgomery County and the author of the Grant letter. He testified that the purpose of the Grant letter was to caution the recipients to make the right decision in regard to where they voted. He denied the letter was intended as a threat, instead characterizing it as informational. Grant explained that his office does not provide legal advice to private citizens, but after receiving several calls from representatives of the RUD, his office felt it was "in the best interest" to remind the voters of the voter registration laws so that there would be no criminal activity in the future. He agreed that if a recipient of the letter reviewed the case law, sought legal counsel, and became convinced they had a right to vote in the RUD election, then they had done everything the letter encouraged them to do. Grant also acknowledged stating to a reporter that it would be helpful if the Secretary of State issued some clear guidelines regarding the definition of residency rather that leaving it "vague."

Richard McDuffee was the first of the voters to testify. McDuffee explained that he learned of the RUD after Jenkins invited him to a "big meeting" at Jenkins's office in March 2010, about two months before the election. McDuffee attended the meeting, along with Heath, Goeddertz, and Jim Doyle, the husband of Sybil Doyle and father of Roberta Cook. At the meeting, Jenkins specifically

11

discussed with McDuffee his desire that McDuffee participate in the RUD election. Jenkins encouraged McDuffee to change his residence to vote in the election, and to run as a candidate for president of the RUD board of directors. Once elected, Jenkins instructed McDuffee that he was to "pay off the bills," "turn the lights out," and "shut [the RUD] down."

Later, at Jenkins's office, McDuffee filled out a voter registration application and also applied as a candidate. After that, McDuffee received the Grant letter, which concerned him and indicated to him that his actions were "not something taken lightly." However, McDuffee did not review the authorities identified in the Grant letter, and he acknowledged that the group's lawyer told him that the legality of voting in the RUD election was too close to call.

McDuffee testified that he voted in the RUD because he believed it was wrong that there had been no contested elections held in the RUD, and because he trusted Jenkins. McDuffee also identified Jenkins as the leader of the group because "[e]verything flowed out of [Jenkins's] office." For example, McDuffee explained that the voter registration forms were to be filled out with the address of the Residence Inn based on information on a sheet of paper posted on the wall in Jenkins's office. McDuffee was also asked to recruit others to change their registrations and vote.

McDuffee also testified that after the election, the group went to the next RUD board meeting and learned that the vote would not be canvassed. Shortly after that, the group learned that they were going to be taken to court. McDuffee confirmed that, although he was counseled by their attorney, Yollick, to make up a reason for moving to the Residence Inn, the real reason he changed his residence was to vote in the RUD election. Further, as far as he knew, none of the ten voters actually moved to the RUD. In preparation for the upcoming civil trial, Yollick

12

also counseled the group to rent more rooms, bring personal items there, and engage in activities at the Residence Inn. Additionally, the pictures the group took of themselves at the Residence Inn were all to make appearances for the civil trial.

When McDuffee later learned there was a criminal investigation, he reached out to the district attorney's office and testified before the grand jury. McDuffee stated that he was not promised leniency for cooperating and he was not indicted by the grand jury. Although McDuffee had not been arrested, he believed the possibility of an arrest remained. McDuffee also testified that even though he did not know he was voting illegally on the day he voted, he was uncertain about the legality of his action because—unlike the others—he had never physically stayed at the Residence Inn, and he believed there had to be a simultaneous physical presence and intent to establish residence.

Benjamin Allison testified next. He stated that he was twenty-six years old, and his brother Robert was eighteen. Benjamin testified that he considered himself to be politically active, and he decided to vote in the RUD election because Heath brought it to his attention. He later met Jenkins at an unrelated political meeting. Motivated by the principle of taxation without representation, both he and his brother decided to change their residence on their voter registrations and stay at the Residence Inn on the night before the election. Benjamin stated that his room was paid for on Jenkins's credit card, and the brothers reimbursed Jenkins for their share of it. He acknowledged that others stayed in the room as well.

Benjamin later learned of the challenge to the election, and testified that Yollick called him to ask if he would be willing to be an intervenor in the civil suit for the purpose of trying to stop the RUD board from invalidating the election. Benjamin and most of the other ten voters, including Jenkins, met with Yollick at his law office to discuss the intervention. According to Benjamin, Yollick

encouraged them to rent additional rooms at the Residence Inn for the foreseeable future and to take the photos of themselves there. Benjamin also changed his driver's license to the Residence Inn's address, but changed it back after the civil trial ended. Benjamin admitted that, other than the voter registration card he filled out, there was no evidence connecting him to the Residence Inn as a residence before he voted.

Benjamin testified that Jenkins did not convince him to vote; he decided to vote based on his own research, including his review of the Secretary of State opinion. He felt that he was engaging in the political process by changing his residence on his voter registration and voting against the RUD board members. Benjamin acknowledged, however, that he did not pay taxes to the RUD unless he voluntarily entered the district and shopped there. Benjamin testified that he did not knowingly commit a criminal offense when he voted, because he believed that all that was required was a physical presence in the district before the election with the intent to return. Benjamin also testified that when he changed his residence to 9333 Six Pines Drive, he intended that to be his permanent voting address.

Peter Goeddertz, who ran for a position on the RUD board and voted from the Residence Inn address, testified that he had lived in Montgomery County for forty years and had voted from his home address for most of those years. Goeddertz had been charged with voter fraud and indicted on the same day as Jenkins, but he testified that he had since reached an agreement with the State and would not be charged with a felony. He also agreed to appear and testify truthfully.

Goeddertz explained that he had known Jenkins for fifteen years and considered him a friend. He and Jenkins were politically active together and it was Jenkins and Heath who brought the RUD issue to his attention. Goeddertz also discussed the RUD with the Allison brothers, McDuffee, Berntsen, and Curry. The

14

group devised a plan to "run for positions and take over the RUD" and then disband it. Goeddertz stated that it was "probably" Jenkins who first pitched the idea, although he described it as a "consensus" plan. Goeddertz, McDuffee, and Berntsen ultimately ran for the board because they were available to do it.

Goeddertz later filled out the voter registration form, changing his residence address to 9333 Six Pines Drive. Goeddertz testified that it was Jenkins who picked the hotel address, and Jenkins also kept track of the people who were changing their registrations to that address. At the time, Goeddertz intended the 9333 Six Pines Drive address to be his permanent voting residence. He did not believe he was committing an offense because it was his understanding that all that was required to establish residency was that his intent and his physical presence coincide. However, Goeddertz admitted that he did not change his voter registration because he intended to make the Residence Inn his home; he did it to vote for himself in the May 8, 2010 election.

After receiving the Grant letter, Jenkins, Goeddertz, and other voters met at Jenkins's office to review the letter. Goeddertz also consulted with Yollick before deciding to go ahead and vote in the election. According to Goeddertz, Jenkins oversaw the room rental at the Residence Inn, and the hotel bill was directed to Jenkins at his office address. Goeddertz stayed in the room two nights with Jenkins and the others. After Goeddertz was elected and the RUD challenged the election results, Yollick agreed to represent the group. Goeddertz subsequently stayed one night at the Residence Inn. On Yollick's advice, Goeddertz took pictures to substantiate that the group was there. Goeddertz also testified that he put his house up for sale at a price that was admittedly "a little high," but he had no interested buyers and ultimately did not sell the property.

After Goeddertz's testimony, the State rested. The defense began its case by

15

presenting Jim Doyle. Doyle had lived at his home in Montgomery County for about forty years, and was a long-time election judge and precinct chair in his home precinct. Doyle described his duties as precinct chair and the election law he had studied in connection with these duties, including reading the Secretary of State opinion and the *Mills* case. Doyle also explained that the Secretary of State's office controls the election process and is ultimately the source of the informational documents and videos he reviews as a precinct chair.

Doyle first learned about the RUD at the library meeting where Heath had given his presentation. After that, Doyle attended a couple of meetings concerning the RUD. At the meetings, Doyle discussed residency requirements with Jenkins, Heath, and Yollick. Doyle also talked to Sybil Doyle, his wife, and Roberta Cook, his daughter, about changing their residences to vote in the RUD election. Sybil and Roberta ultimately changed their residences and voted, but Doyle did not do so because if he moved out of his district he could no longer be precinct chair.

The defense next presented Adrian Heath, who testified that he was a politically active resident of Montgomery County who had an interest in issues of local government debt. When he learned about the RUD's level of debt and the lack of contested elections for its board members, Heath investigated further. Among other things, Heath obtained financial information, some check registers, and a map from the RUD. Heath also obtained voter registration records of the existing voters in the RUD from the office of the county election registrar, and contacted the Secretary of State's office to ask about what he thought were "anomalies and unconstitutional issues surrounding the RUD" and how they could be remedied. He also actively sought to inform others about the RUD as part of his effort to "force an election." While researching voter registration requirements, Heath discussed the Secretary of State opinion at length with Joe Kulhavy, the

chief elections officer of the Secretary of State.

Heath could not run for one of the open seats on the RUD board himself because he was running for county judge at the time, so he decided to find other people to run so that an election would have to be held. Heath also decided to change his address on his voter registration to establish his residence within the RUD for voting purposes. After Heath changed his address to 9333 Six Pines Drive, he received the Grant letter. He reviewed the letter, read the suggested authorities, and consulted with an attorney as advised. Heath believed that, based on the Secretary of State opinion and his reading of *Mills*, he needed only a combination of intent and bodily presence in a location to establish a residence for voting purposes, and there was no durational residency requirement. Heath testified that he believed he had legally established his residence at the hotel when he filled out the voter registration change of address form. Additionally, he testified that he intended to vote in all future elections from that address.

Heath further stated that he had two residences—one at his home address and one at 9333 Six Pines Drive, which was his "residence for voting purposes" as that phrase is used in the Attorney General opinion. But Heath did not know if that phrase appeared in any written law in Texas. When asked whether the hotel was his "home and fixed place of habitation to which [he] intended to return after any temporary absence," Heath replied that it was, even though he estimated that he had stayed overnight at the Residence Inn as few as ten nights over the last three years. Heath described all of the other nights he did not stay overnight as "temporary absences" from the Residence Inn.

The next witness to testify was attorney Eric Yollick, who testified that he had known Jenkins since the mid-1990s and considered him to be one of the most politically active people he had ever met. Jenkins brought the Grant letter to him

17

and asked for his counsel on the law of establishing a residence for voting purposes.[6] Testifying only as a fact witness, Yollick explained that he discussed with Jenkins the resources identified in the Grant letter, in particular the Secretary of State opinion and the Attorney General opinion. He also reviewed and discussed with Jenkins the *Mills* case, the election code statutes on voter eligibility and residence, and related information.

Yollick testified that he was hired to represent Jenkins and the other intervenors in the RUD lawsuit, but he denied that his office invited the group of voters to a meeting to ask them to become intervenors. He also denied telling the intervenors to rent more rooms to show their intention to reside at the Residence Inn, saying that it was not relevant and was none of his business. He also denied chastising Jenkins "for being too cheap and not booking enough rooms." However, Yollick acknowledged that he met with some of the intervenors at the Residence Inn, twice socially and three times for business meetings. He recalled that Jenkins, Heath, Curry, McDuffee, Berntsen, and the Allison brothers were at all or most of the meetings.

Lastly, Jenkins testified in his own defense. He described his personal and professional background, and described himself as "extremely analytical and very focused." Jenkins explained that he had met many of the people involved in the RUD election through his political activities. Several were also involved in helping him lodge Texas Ethics Commission complaints against elected officials based on

---

[6] At this point, the trial court held a discussion at the bench concerning whether Yollick could testify as an expert witness. The jury was excused for the day, and Yollick was questioned at length concerning the foundation for any opinions he might give. The trial court ultimately ruled that Yollick would not be allowed to testify as an expert because whether Jenkins knew that he did not reside in the precinct in which he voted was an element of the offense that was a matter for the jury to determine. Therefore, Yollick was not permitted to testify as to the advice he ultimately gave Jenkins.

their campaign finance reports. Jenkins explained that his purpose in making the complaints was to hold elected officials accountable.

Jenkins testified that he was in the RUD practically every day, driving on the roads, banking, shopping, going to the post office, walking the trails, and going to the Pavilion, an outdoor music venue. When Jenkins learned about the RUD from Heath, he was shocked that he had been unaware of the RUD's activities and the lack of contested elections. Jenkins also learned that the RUD held its board meetings in the boardroom of the Woodlands Development Company, which troubled him because he reasoned that even if people were interested in the RUD, they would be unable to find out where the meetings were held so that they could attend. Jenkins believed that although the RUD impacted everyone in the Woodlands, the public had no input in its activities; consequently, he felt "totally disenfranchised."

After reading the Secretary of State opinion, Jenkins concluded that "everybody has an equal right for voting and they get a chance to choose where they want to reside and not somebody else . . . for voting purposes." He understood that the Secretary of State opinion concerned students at Prairie View University, but he believed that it applied to him as well because the last sentence of the opinion stated that the principles discussed apply equally to other voters and that no more could be required of them to register and vote in Texas. Jenkins also decided that the first step to validly vote in an election was to register to vote thirty days before the election, but he also concluded that this was an administrative requirement only and not a requirement that he actually reside at the chosen location at the time of registration.

Jenkins further testified that, based on the Secretary of State opinion, he believed that establishing a residence was more about a general location, rather

19

than a specific dwelling or abode, and about being a community member. According to Jenkins, "your particular location is a location that you decide to call for voting purposes your residence." Jenkins pointed out that the Secretary of State opinion also relied on *Mills*, which explains that bodily presence alone and intention alone do not determine a residence, but when the two coincide, at that moment the residence is fixed and determined. Additionally, Jenkins noted, the *Mills* case reflects that there is no specific length of time for the bodily presence to continue. Consequently, Jenkins determined that once a residence is established, it is unnecessary to remain there.

Jenkins testified that, when he filled out the voter registration form changing his residence address to 9333 Six Pines Drive, he had "easily" maintained a bodily presence in the RUD for twenty years, since there was hardly a day that he was not in the RUD at some point. Jenkins testified that he also intended to make the RUD his residence for voting purposes for the indefinite future. Thus, when he completed the voter registration form, Jenkins believed he was fully complying with the law.

Jenkins explained that he chose the Residence Inn as his residence because it was in the RUD, it was across the street from a favorite restaurant, and it was convenient to his activities in the RUD. Jenkins had also considered staying at the Residence Inn in anticipation of selling his home at 16 Pastoral Pond Circle. He stated that he had been thinking of selling because he was retiring and wanted to downsize, and he was also concerned that the house bordered a floodplain. Ultimately, though, no buyers expressed interest, and as of the time of trial, he still lived in the home.

When Jenkins received the Grant letter, he felt that it was an attempt to suppress the vote, which also made him feel disenfranchised. He took the Grant

20

letter to his long-time friend, Yollick, and together they reviewed the letter, the Secretary of State opinion, the election code—including the statutes on residency requirements—and other information "in great detail." Jenkins also reviewed the Attorney General opinion, which he felt supported the Secretary of State opinion because it also cited *Mills* and emphasized that "every citizen has the right to determine his own residence." Jenkins concluded that, based on his research and his consultation with Yollick, he was fully within the law by registering to vote at the hotel. Jenkins denied putting down an improper address for his residence, and he denied influencing others to change their residence to the hotel.

On cross-examination, Jenkins also denied knowing he was ineligible to vote on the day he voted. Jenkins acknowledged that the relevant portions of the election code's definition of residence were:

- "residence" means "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence";
- "residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the code";
- "[a] person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only"; and
- "[a] person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home."[7]

Jenkins also acknowledged that the election code was the governing law, and that the statutory definition "probably" trumps anything inconsistent in the common law. Jenkins agreed that, at least for some people, a hotel would be a good example of a place that people go to for temporary purposes only. But Jenkins disagreed that his home at 16 Pastoral Pond Circle was a good example of a home he left to

---

[7] Tex. Elec. Code § 1.015(a)–(d).

go to a hotel for temporary purposes because "as the home got sold, [he] would have no place to go back to." Jenkins acknowledged, however, that his home was not sold.

Jenkins also admitted that, except for the sixteen or seventeen days he stayed at the Residence Inn over the last three years, he has regularly returned to either his home at 16 Pastoral Pond Circle or his office. However, Jenkins denied that 16 Pastoral Pond Circle was his habitation; he stated that for the last twenty years his habitation has been the RUD. Jenkins explained that his definition of a "habitation" was "what your habits are, what includes your habits," and for that reason the Residence Inn, rather than his home, was his habitation. Jenkins expounded on the definition of a "permanent habitation" as "where I go; where I am; what district I'm in," and concluded that it would not necessarily include where he lives or sleeps. In fact, Jenkins testified that he believed that everybody has a right to go stay in a hotel somewhere and overthrow a utility district if they meet the definition of bodily presence combined with intent, because that is their fundamental right.

Jenkins ultimately agreed that the concept of "residence for voting purposes" and residence as defined in the election code is the same thing. Jenkins believed that his understanding of the law comported with the statutory definition of "residence" because, while the definition includes references to one's "home," it refers to "place" five times, and "place" means a locality or an area. Consequently, for Jenkins, the RUD was the place where he spent his time. Jenkins further pointed out that the words "dwelling" or "house" are not mentioned in the definition of "residence," and he denied that "habitation" meant dwelling or abode. Jenkins admitted that, as of the time of trial, his "residence for voting purposes" was again his home at 16 Pastoral Pond Circle. Nevertheless, Jenkins denied that

22

he had been mistaken or that he had done anything wrong when he changed his residence to the Residence Inn to vote in the May 8, 2010 election, and he maintained that he voted lawfully in that election.

After Jenkins's testimony, the defense rested. The State then recalled as rebuttal witnesses Benjamin Allison, Goeddertz, and McDuffee to rebut portions of Yollick's testimony. Allison testified that, after the election, Yollick's office called and asked if his name could be used in the intervenors' lawsuit. Allison also testified that at a meeting concerning the lawsuit, Yollick insisted that some of them needed to move back to the Residence Inn to strengthen their case. Goeddertz similarly testified that Yollick told the group to spend more time at the Residence Inn to "look good" to the court. McDuffee testified that, not only was Yollick adamant that the group needed to return to the Residence Inn, he also instructed them to plan for expenses to rent more rooms than just the two that were rented on the night before the election, and to come up with a reason for moving to the Residence Inn. McDuffee also testified that it was Yollick's idea to have photographic proof of their physical presence at the Residence Inn after the election.

The parties then rested their cases. At the formal charge conference that followed, the trial judge denied the defense's request to include the statutory defense of mistake of law in the charge for two stated reasons. First, the judge determined that Jenkins was not entitled to the affirmative defense because he did not admit that he committed the conduct charged, which was that he voted in an election in which he knew he was ineligible to vote. Second, the judge explained that, in his view, Jenkins's argument that he reasonably relied on the proffered authorities when he registered to vote and voted in the RUD election using the address of the Residence Inn was really a challenge to an element of the offense

the State was required to prove, namely, that Jenkins knew he was ineligible to vote in the RUD election. The judge noted that the defense's first two exhibits were the Secretary of State opinion and the Attorney General opinion, and that both opinions discussed *Mills*. Accordingly, the judge reasoned that the defense's arguments and authorities were already before the jury for purposes of determining whether the State proved that Jenkins knew he acted illegally in voting in the election.

As charged, the jury found Jenkins guilty. Consistent with the jury's assessed punishment, the trial court sentenced Jenkins to three years' imprisonment and a $10,000 fine.

## ANALYSIS OF JENKINS'S ISSUES

Jenkins's primary argument on appeal is that the trial court reversibly erred by refusing to include in its charge to the jury an instruction on the mistake of law defense codified in section 8.03 of the Penal Code, which was both raised by the evidence and specifically requested by defense counsel. Jenkins also argues that section 1.015 of the Election Code is unconstitutionally vague as applied to him because the definition of "residence" is fatally ambiguous and encourages arbitrary enforcement of the penal law in violation of Jenkins's right to due process under the state and federal constitutions. Because we conclude that the trial judge reversibly erred by denying Jenkins's requested statutory defense of mistake of law, we sustain his first issue and do not reach the second. [8]

---

[8] It is well settled that the constitutionality of a statute is not to be determined unless such a determination is absolutely necessary to decide the case. *See, e.g., Turner v. State*, 754 S.W.2d 668, 675 (Tex. Crim. App. 1988); *Coberly v. State*, 644 S.W.2d 734, 735 (Tex. Crim. App. 1983) (per curiam). Because we are reversing and remanding the case based on charge error, it is unnecessary to address Jenkins's constitutional issue. *See Coberly*, 644 S.W.2d at 735 (instructing that it was unnecessary for the appellate court to address the merits of appellant's constitutional issues after it had concluded that the case should be reversed and remanded due to

24

## A.    Standard of Review

Appellate review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error occurred. *Id.* at 731. If so, we must then analyze whether sufficient harm resulted from the error to require reversal. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Under this second step, the degree of harm necessary for reversal depends on whether the appellant properly preserved the error by objection. *Id.* When, as here, error in the charge is preserved for review, reversal is required if the error caused "some harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).[9]

The trial court must provide the jury with "a written charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. art. 36.14; *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007). The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence. *See* Tex. Penal Code § 2.04; *Walters*, 247 S.W.3d at 208–09. "[A]n erroneous or an incomplete jury charge jeopardizes a defendant's right to jury trial because it fails to properly guide the jury in its fact-finding function." *Abdnor*, 871 S.W.2d at 731.

---

charge error). Additionally, to the extent that Jenkins seeks dismissal of his indictment by his second issue, we note that in his appellate briefing Jenkins requested only a remand for new trial rather than dismissal. This court cannot grant more relief than an appellant has requested. *Banks v. State*, 158 S.W.3d 649, 650 n.1 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

[9] The State suggests that Jenkins failed to preserve his charge error complaint, arguing that nothing in the record indicates any sort of argument in favor of a mistake of law instruction, only "an indication that Jenkins gave the trial court a proposed instruction." The State further contends that, after the trial court denied the proposed instruction, Jenkins did not object and made no argument mirroring that on appeal. However, the record reflects that Jenkins timely presented his proposed instruction in writing to the trial court, the trial court denied it, and it was filed with the court. We conclude that Jenkins has sufficiently preserved error. *See* Tex. Code Crim. Proc. art. 36.15; *Chase v. State*, 448 S.W.3d 6, 12 (Tex. Crim. App. 2014).

A defendant "has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence." *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. *Granger*, 3 S.W.3d at 38. However, "if the defensive theory is not explicitly listed in the penal code—if it merely negates an element in the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it." *Walters*, 247 S.W.3d at 209; *see Giesberg v. State*, 984 S.W.2d 245, 250–51 (Tex. Crim. App. 1998) ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court concludes [that] a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction."). The question in this case is what happens when the requested instruction is warranted by the evidence and listed in the Penal Code, but also appears to negate an element of the State's case.

### B. Jenkins's Alleged Election Code Violation and the Mistake of Law Defense

#### 1. Did the trial court err by refusing the requested statutory defense of mistake of law?

Chapter 64 of the Texas Election Code provides that a person commits the offense of illegal voting "if the person votes . . . in an election in which the person knows the person is not eligible to vote." *See* Tex. Elec. Code § 64.012(a)(1).[10] To

---

[10] At the time of the May 8, 2010 RUD election, this offense was a third-degree felony. *See* Act of May 9, 1985, 69th Leg., R.S., ch. 211, 1985 Tex. Gen. Laws 881 (amended 2011) (current version at Tex. Elec. Code § 64.012(b)). As amended, the severity of the offense is increased to a second-degree felony. *See* Tex. Elec. Code § 64.012(b). Because section

26

be eligible to vote in an election in this state, a person must, among other things, be "a resident of the territory covered by the election for the office or measure on which the person desires to vote." Tex. Elec. Code § 11.001(a)(2).

The Election Code statute defining "residence" provides, in relevant part:

> (a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.
>
> (b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.
>
> (c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.
>
> (d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

*Id.* § 1.015(a)–(d).

Consistent with the statutory language, Jenkins's indictment charged that he "did then and there vote in an election in which the Defendant knew he was not eligible to vote, to-wit: Defendant voted in the May 8, 2010 Woodlands Road Utility District Board of Directors election, when he knew he did not reside in the precinct in which he voted." Therefore, the State was required to prove that Jenkins (1) voted in an election (2) knowing he did not reside in a precinct in the territory covered by the RUD election of May 8, 2010. *See Medrano v. State*, 421 S.W.3d 869, 884 (Tex. App.—Dallas 2014, pet. ref'd).

Although a defendant's ignorance of the law is no defense to prosecution, section 8.03(b)(2) of the Texas Penal Code provides that "[i]t is an affirmative defense to prosecution that *the actor reasonably believed the conduct charged did*

---

64.012(a)(1) was not amended, however, we will refer to the current version of the statute.

27

*not constitute a crime and that he acted in reasonable reliance* upon:

> (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or
>
> (2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Tex. Penal Code § 8.03(b) (emphasis added); *see also id.* § 8.03(a) ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). Thus, to be entitled to the statutory defense of mistake of law, a defendant must present some evidence that (1) he reasonably believed that his conduct did not constitute a crime; and (2) he reasonably relied upon either an official statement of the law or a written interpretation of the law of the type specified in the statute. *Id; see Green v. State,* 829 S.W.2d 222, 223 (Tex. Crim. App. 1992).

Reliance on advice of counsel does not constitute a permissible mistake of law. *Barrera v. State,* 978 S.W.2d 665, 671 (Tex. App.—Corpus Christi 1998, pet. ref'd); *Gallegos v. State,* 828 S.W.2d 577, 579 (Tex. App.—Houston [1st Dist.] 1992, no pet.). Instead, section 8.03(b) "requires reliance on a narrow class of official statements or interpretations of the law." *Hawkins v. State,* 656 S.W.2d 70, 73 (Tex. Crim. App. 1983). Moreover, "[s]ection 8.03 was not created to allow a criminal defendant to rely upon old interpretative opinions, opinions that conflict with others, or on overruled opinions." *Green v. State,* 829 S.W.2d 222, 223 (Tex. Crim. App. 1992) (citing *Linder v. State,* 779 S.W.2d 520, 523 (Tex. App.—Waco 1989, pet. ref'd) (internal quotations omitted)).

In this case, the Secretary of State and Attorney General opinions were admitted into evidence, and although the trial court did not admit a copy of the

*Mills* case, the court permitted the parties to refer to the case because it was discussed in the two advisory opinions. It is undisputed that these documents constitute written interpretations of the law for purposes of section 8.03(b)(2). For convenience, we refer to the two opinions and the *Mills* case collectively as "the election law authorities."

### a.     *The confession and avoidance doctrine*

Jenkins contends that the trial court erred when it concluded that he was not entitled to a mistake of law instruction because he did not "confess" or admit he committed the allegedly wrongful conduct. In so doing, Jenkins maintains, the trial court erroneously relied on the confession and avoidance doctrine, which does not apply to defensive issues—like mistake of law—that negate the culpable mental state required for the commission of the offense. *See Juarez v. State*, 308 S.W.3d 398, 401–02 (Tex. Crim. App. 2010) (explaining that the confession and avoidance doctrine is inapplicable when "the defensive issue, by its terms, negates the culpable mental state").

A "confession and avoidance" or "justification" defense does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct. *See Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007). Accordingly, with respect to such defenses, "a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Id.* at 659 (emphasis in original). Examples of confession and avoidance or justification defenses include the Good Samaritan defense, necessity, and self-defense. *Juarez*, 308 S.W.3d at 401–02.

The State argues that the trial court correctly refused to instruct the jury on

29

the mistake of law defense because, as the trial court implicitly concluded, the statutory defense of mistake of law is an affirmative defense, and as such, is subject to the confession and avoidance doctrine. *See* Tex. Penal Code § 8.03(b) ("It is an affirmative defense to prosecution . . . .); *Meraz v. State*, 785 S.W.2d 146, 153 (Tex. Crim. App. 1990) (stating that every affirmative defense requires that the defendant acknowledge he committed the otherwise illegal conduct, and noting that Penal Code section 8.03 is an affirmative defense). The Court of Criminal Appeals has since observed, however, that "the doctrine does not apply when the defensive issue, by its terms, negates the culpable mental state," citing as an example "[t]he affirmative defense of mistake of fact." *Juarez*, 308 S.W.3d at 402; *see Cornet v. State*, 359 S.W.3d 217, 225 (Tex. Crim. App. 2012) ("We clarified, in *Juarez*, that the defensive issues the [confession and avoidance] doctrine does *not* apply to are those that 'by [their] terms, negate[] the culpable mental state' required for commission of the offense."); *see also* Tex. Penal Code § 8.02(a) (defense of mistake of fact).

Recognizing that *Juarez* illustrates that not every affirmative defense is subject to the confession and avoidance doctrine, the State next contends that the doctrine nevertheless applies to the mistake of law defense because it does not negate any element of the offense, but only excuses what would otherwise amount to criminal conduct. *See Cornet*, 359 S.W.3d at 224–25 (holding that statutory "medical-care defense" was subject to the confession and avoidance doctrine because it "does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct") (quoting *Shaw*, 243 S.W.2d at 659). Neither party directs us to any case law holding that the statutory defense of mistake of law is a confession and avoidance or justification defense, and we have found none. Therefore, we turn to the language of Penal

Code section 8.03 for guidance.

We construe a statute in accordance with the plain meaning of its text, unless the language of the statute is ambiguous or the plain meaning would lead to absurd results that the legislature could not have possibly intended. *Chase v. State*, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014). If the legislature's intent cannot be determined from the statutory text alone, we may turn to extra-textual sources such as legislative history to construe the statute. *Logan v. State*, 89 S.W.3d 619, 627 (Tex. Crim. App. 2002).

For purposes of our analysis, we focus on that portion of section 8.03(b) providing that "[i]t is an affirmative defense to prosecution that the actor reasonably believed that the *conduct charged* did not constitute a crime and that he acted in reasonable reliance upon" specific types of official statements or interpretations of the law. *See* Tex. Penal Code § 8.03(b) (emphasis added). The Penal Code defines "conduct" as "an act or omission and its accompanying mental state." *See id.* § 1.07(a)(10). Therefore, "the conduct charged" would include both an act and any accompanying mental state. *Id.* § 8.03(b). The operative language of section 8.03(b) is that the actor "reasonably believes" the charged conduct is not a crime and acts in "reasonable reliance" on official statements or interpretations of the law—mental states that necessarily negate a culpable mental state that is in some way based on knowledge of the law or legal concepts. *See id.* Consequently, we conclude that the plain language of Penal Code section 8.03 demonstrates that the legislature intended the mistake of law defense to apply when a charged offense includes, as an element of the crime, a culpable mental state that incorporates knowledge of the law or legal concepts and the accused has presented some evidence that he reasonably believed his conduct did not constitute a crime because he acted in reasonable reliance on official statements or interpretations of

31

the law as specified in the statute.[11] *See Giesberg*, 984 S.W.2d at 248 (recognizing that the Penal Code includes not only justification defenses, but also "defensive theories which do not involve admission of complicity in the commission of the alleged crime, but which nonetheless attempt to explain why a defendant is not criminally culpable").

Applying the mistake of law defense in this case demonstrates the flaw in the State's position, because a jury could not conclude that Jenkins "knew he did not reside in the precinct in which he voted" and also conclude, based on mistake of law, that Jenkins "reasonably believed" that he did not commit a crime by voting in the election based on his "reasonable reliance" on the election law authorities. Because a jury could not find both to be true, the mistake of law defense as applied on these facts does not operate as a "confession and avoidance" or "justification" type defense, because it does not merely provide a legal excuse for otherwise criminal conduct.

Nor is it dispositive, as the State argues, that the wording of the mistake of law defense does not track that of the mistake of fact defense, which is recognized as an affirmative defense not subject to the confession and avoidance doctrine. *See Juarez*, 308 S.W.3d at 401–02. The mistake of fact defense provides that "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact *if his mistaken belief negated the kind of culpability required for commission of the offense.*" *See* Tex. Penal Code § 8.02(a) (emphasis added). The State suggests that because the mistake of law defense does not "expressly" negate the culpable mental state—as does the defense of mistake of fact—the

---

[11] Both parties seek support for their conflicting interpretations of the statute based on the difference between the language of the Model Penal Code and Penal Code sections 8.02 and 8.03. However, because we conclude the legislature's intent is unambiguous, it is unnecessary to resort to any extra-textual authorities. *See Logan*, 89 S.W.3d at 627.

omission signals that the legislature intentionally drafted the mistake of law defense to make it inapplicable in a situation in which a party was attempting to negate the mental element, as Jenkins is attempting to do here.

We recognize that the two defenses employ different wording to effectuate their intended application. But we disagree with the State that the differences compel the conclusion that mistake of law is a defense subject to the confession and avoidance doctrine. The legislature drafted the definition of mistake of law to reflect the defense's narrowly tailored function to provide a limited defense to a person who reasonably believes their conduct is not criminal based on that person's reasonable reliance on limited categories of specific legal authorities. *See* Tex. Penal Code § 8.03(b); *Hawkins*, 656 S.W.2d at 73; *see also* 43 George E. Dix & John M. Schmolensky, Texas Practice: Criminal Practice and Procedure § 43:42, at 943–44 (3d ed. 2011) (noting that section 8.03 "carves out a very narrow exception" to the rule that ignorance of the law is no defense). In contrast, the mistake of fact defense provides a defense based on "a reasonable belief about a matter of fact" that also negates the culpable mental state of the charged offense. *See* Tex. Penal Code § 8.02(a). Thus, we conclude that the legislature employed different wording, not to signal a difference in the application of the defenses, but in recognition of the distinctive functions of each defense.

We hold that Penal Code section 8.03 by its terms may be applied to negate the culpable mental state of an alleged offense when an accused contends that he reasonably believed his conduct was not criminal based on his reasonable reliance on official statements or interpretations of the law. *See id.* § 8.03(b); *see also Ostrosky v. Alaska*, 913 F.2d 590, 595 (9th Cir. 1990) (recognizing that "[t]he purpose of a mistake-of-law defense is to negate the mental state that the defendant must have to be guilty of the charged crime"). Professors Dix and Schmolesky

have similarly observed that, "[a]lthough the caption of the statutory defense is 'mistake of law,' a more accurate statement would indicate that a limited exception [to the rule that ignorance of the law is no excuse] is recognized for reasonable reliance upon an official written statement of the law." Dix & Schmolesky, *supra*, at 944. As such, the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine. *Cf. Juarez*, 308 S.W.3d at 401–02. We therefore hold that Jenkins was not required to admit to the commission of a criminal offense or concede that he erroneously relied on the law to be entitled to a jury instruction on mistake of law.

### b.     *Applicability of the mistake of law defense to illegal voting offense*

We next address the State's suggestion that the legislature drafted the illegal voting statute, Election Code section 64.012, "in such a way as to immunize it from a mistake-related defense." *See* Tex. Elec. Code § 64.102. According to the State, knowledge of the law is not relevant to a prosecution for illegal voting, because all the State is required to prove is that the Residence Inn was not Jenkin's "domicile, [or] fixed place of habitation, to which he intended to return after a temporary absence." *See id.* § 1.015(a); *Medrano*, 421 S.W.3d at 885 (holding that the State was not required to prove voter subjectively knew she was not eligible to vote, only that she voted in an election when she knew she was not a resident of the precinct for which she was voting). Because the illegal voting statute does not require the State to prove that Jenkins knew he was violating election law and the offense does not provide for a good-faith exception, the State asserts, Jenkins is not entitled to a mistake-related defense. *See Celis v. State*, 416 S.W.3d 419, 432 (Tex. Crim. App. 2013); *Tovar v. State*, 949 S.W.2d 370, 373–74 (Tex. App.—San Antonio 1997), *aff'd*, 978 S.W.2d 584 (Tex. Crim. App. 1998).

34

The culpable mental state of the illegal voting statute requires that the person votes or attempts to vote in an election in which the person "*knows* the person is *not eligible* to vote." *See* Tex. Elec. Code § 64.012(a)(1) (emphasis added). To be eligible to vote, a person must, among other things, "be a *resident* of the territory covered by the election for the office or measure on which the person desires to vote." *Id.* § 11.001(a)(2) (emphasis added). And, to be a resident, the person must satisfy the election code's definition of "residence." *See id.* § 1.015. In this case, the jury was instructed to find Jenkins guilty of the charged offense if it found beyond a reasonable doubt that Jenkins voted in the May 8, 2010 RUD election "when [Jenkins] *knew* he was *not eligible* to vote *because he knew he did not reside* in the precinct in which he voted" (emphasis added). The charge also tracked the relevant election code definitions of both eligibility and residence.

Jenkins did not deny registering to vote and voting in the RUD election, but he disputed that at the time he cast his vote he acted "knowingly," i.e., that he "knew he was not eligible to vote because he knew he did not reside" in the RUD. Jenkins's entire defense was that he reasonably believed that he did, in fact, reside in the RUD when he registered to vote and voted, based on his reasonable reliance on the election law authorities' interpretation of the very election law the jury was instructed to apply when determining Jenkins's guilt. Consequently, as applied in this case, Jenkins's guilt or innocence turned on his understanding of where he resided based on the election code's definition of residency and distinguishes this case from *Medrano*, on which the State relies.

In *Medrano*, the defendant, Carlos Medrano, was charged with soliciting a niece, Veronica Medrano, to illegally vote in an election in which Medrano was a candidate for office. *See* 421 S.W.3d at 873, 881. Veronica filled out a voter registration card and voted in the election when she knew she was using an address

35

where she did not reside, she knew she was not a resident of the precinct in which she voted, and she knew that to vote in the election she had to lie on her voter registration card. *See id.* at 875. Thus, there was no dispute that Veronica knew where she resided. On appeal, the court rejected Veronica's contention that the evidence was insufficient to prove that she knew she was not eligible to vote. *Id.* at 885. The court reasoned that the State only needed to prove that Veronica voted in the election "when she knew she was not a resident of the precinct for which she was voting," based on the general rule that "ignorance of the law is no excuse." *Id.*

In this case, however, Jenkins's challenge to the knowledge requirement was based on the mistake of law exception to the general rule found in section 8.03 of the Penal Code. *See* Tex. Penal Code § 8.03(a), (b). Because Jenkins's knowledge of where he resided turned on his understanding of the legal requirements for residence under the election code, the mistake of law defense was applicable in the rather unique circumstances presented in this case.

### c.    *Reasonable conduct and reasonable reliance*

Jenkins contends that he was entitled to the mistake of law jury instruction because a fact issue was raised as to whether he satisfied the requisites of Penal Code section 8.03(b)(2). At trial, Jenkins steadfastly maintained that based on his review of the election law authorities, he reasonably believed he was a resident, for voting purposes, of the precinct in which he voted. Jenkins argues that the authorities he consulted and relied on, even before he received the Grant letter, included many of the same ones that First Assistant District Attorney Phil Grant suggested that he should review. Jenkins also argues that even Grant acknowledged that the Secretary of State's opinions left the definition of residence vague.

The State responds that there is no evidence Jenkins reasonably believed his

36

conduct was lawful or that he reasonably relied on the election law authorities. *See* Tex. Penal Code § 1.07(42) (defining "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor"); *Wilson v. State*, 777 S.W.2d 823, 824 (Tex. Crim. App. 1989) (stating that "ordinary standards of reasonableness" means the standards that an ordinary and prudent person would apply to the circumstances that the actor faced).

Among other things, the State argues that an ordinary and prudent person would see that a plan to overthrow a utility district, which involved conspiring with nine other people to establish "residency for voting purposes only"[12] at a hotel within the utility district, was obviously criminal. The State also argues that Jenkins's reliance on the election law authorities was unreasonable because the statutory definition of residence is the controlling law; neither the statutory definition nor the election law authorities support Jenkins's theory of "residence for voting purposes only"; and Jenkins's reliance on opinions specifically addressing college students, and his conclusion that that the election law authorities applied to him, was insufficient to warrant a mistake of law instruction. In essence, the State contends that Jenkins's conduct and reliance on the election law authorities rather than the statutory definition of "residence" in the election code was unreasonable as a matter of law. *See Green*, 829 S.W.2d at 223.

To support its contention that Jenkins was not entitled to the instruction based on his subjective belief that the election law authorities applied to him, the State relies on *Green* and *Hefner v. State*, 735 S.W.2d 608 (Tex. App.—Dallas 1987, pet. ref'd), *abrogated on other grounds by Campbell v. State*, 5 S.W.3d 693

---

[12] Jenkins takes issue with the State's assertion that Jenkins wanted to establish "residency for voting purposes *only*" as misleading and not fairly supported by the record. As Jenkins points out, his testimony reflected that he was of the opinion that the term "residence" or "residency" has different meanings depending on the context in which it is used, such as residency for purposes of voting, obtaining a driver's license, or becoming a candidate for office.

(Tex. Crim. App. 1999). In *Green*, the Court of Criminal Appeals held that the trial court did not err by refusing an instruction based on mistake of law, concluding that a defendant's reliance on dicta from *Taylor v. Taintor*, 83 U.S. 366 (1873), was unreasonable as a matter of law. 829 S.W.2d at 222–23. The defendant, who had been convicted of murder, argued that the case formed the basis for his belief that a surety possessed the same authority and powers of arrest as a peace officer. *Id.* The court rejected this argument, noting that the common law as stated in *Taylor* was "not the law in Texas nor has it been since the Legislature abrogated the common law by enacting guidelines which defined the law as it applies to sureties seeking to apprehend their principals." *Id.* at 223. Additionally, the court noted that the mistake of law defense "was not created to allow a criminal defendant to rely upon old interpretive opinions, opinions that conflict with others, or on overruled opinions." *Id.* (internal quotations and citations omitted).

In *Hefner*, attorney Hefner was charged with theft of client funds. *See* 735 S.W.2d at 610–611. The court first held that Hefner failed to preserve error because his requested special instruction on mistake of law failed to apply the law to the facts of the case, and the record failed to disclose any court opinion or statement by a public official which would have justified a reasonable belief that Hefner's conduct was not criminal. *Id.* at 625. The court went on to note that even if the record contained evidence of an opinion or official statement on which Hefner relied, the evidence would not support the instruction because Hefner's purported reliance on court opinions to believe that certain trial court orders were void was irrelevant to his prosecution for theft. *Id.*

We conclude that the present case is distinguishable from *Green* and *Hefner*. In this case, the election law authorities were admitted into evidence and were the foundation of Jenkins's defense. The State does not contend that these authorities

38

are out of date, overruled, or contain incorrect statements of the law of residency applicable to voting. Indeed, the State agrees with these authorities that the Election Code's definition of residence in section 1.015 "applies equally to everyone, student or non-student alike, that one's subjective intent to reside is relevant, that there are no durational requirements, and that stays in hotels for long or short periods of time may be evidence of residency." Moreover, the statutory definition of residence included in the Secretary of State opinion expressly provides that residence "shall be determined in accordance with the common-law rules, as enunciated by the courts of this state" except as otherwise provided by the code. *See* Tex. Elec. Code § 1.015(b). In the *Mills* case, on which the election law authorities rely, our supreme court acknowledged that "residence" in the context of voting is an "elastic" term that "is extremely difficult to define." *Mills*, 377 S.W.2d at 637. And, as the Grant letter reflects, even the Montgomery County District Attorney's office believed the election law authorities were appropriate resources for determining one's residence.[13]

Jenkins was indicted for voting in the May 8, 2010 RUD election when he knew he did not reside in the precinct in which he voted. As recounted above, Jenkins maintained at trial that, based on his review of the election law authorities, he believed he was a resident of the precinct in which he voted. *See Dyson*, 672 S.W.2d at 463 ("The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge."). Considerable additional evidence also was adduced raising a fact issue concerning whether Jenkins's belief was reasonable and whether the surrounding circumstances were consistent with that belief. In an analogous circumstance, the Court of Criminal Appeals has instructed that whether

---

[13] Notably, and perhaps unfortunately, the suggested resources recommended in the Grant letter did not include the statutory definition of residence contained in Election Code section 1.015.

a defendant's belief is reasonable is a fact issue for the jury to decide. *See Granger*, 3 S.W.3d at 39.

In *Granger*, the court rejected the State's argument that the reasonableness of a defendant's mistaken belief "may be evaluated by the trial judge in determining whether the statutory defense is raised." *See id.* As the court explained:

> [A] holding in accordance with the State's position would tend to undermine the general rule that the jury should be responsible for gauging the credibility and veracity of the defensive evidence. *See Dyson*, 672 S.W.2d at 463 ("The issue before this Court is not the truth of appellant's testimony, for that is for the jury"); *Montgomery*, 588 S.W.2d at 952 ("The issue on appeal is not whether appellant's story is true or even believable. That issue is exclusively for the jury as trier of fact"). Trial court judges charged with evaluating the "reasonableness" of an accused's beliefs, no matter how well intentioned, would inevitably be placed in a position in which they were required to make their own decisions about the weight and believability of the defensive evidence.

*Id.* at 40.

Viewing the testimony in the light most favorable to Jenkins, as we must, we conclude that the evidence raised a fact issue concerning whether Jenkins's beliefs were reasonable and, accordingly, the issue was one for the jury to decide. *See id.* at 39–41 (holding that defendant who raised an issue of mistaken belief as to the culpable mental element of murder was entitled to a jury instruction on the affirmative defense of mistake of fact); *Jackson v. State*, 646 S.W.2d 225, 227 (Tex. Crim. App. 1983) (holding that defendant's reasonable belief would have negated the culpability necessary for the State's case and therefore the jury should have been charged on mistake of fact issue); *cf. Roberts v. State*, 319 S.W.3d 37, 51 (Tex. App.—San Antonio 2010, pet. ref'd) (holding that jury charged on

defense of mistake of law was entitled to reject testimony of defendant and expert offered in support of defensive argument).

We conclude that the trial court erred by denying Jenkins's requested jury instruction on the statutory defense of mistake of law contained in Penal Code section 8.03, because Jenkins presented some evidence that he reasonably relied on the election law authorities when he voted in the May 8, 2010 RUD election and the reasonableness of Jenkins's beliefs and conduct was an issue for the jury to decide. *See* Tex. Code Crim. Proc. art. 36.14; Tex. Penal Code §§ 2.04 & 8.03(b); *Walters*, 247 S.W.3d at 208–09; *Granger*, 3 S.W.3d at 38; *see also Willis v. State*, 790 S.W.2d 307, 314–15 (Tex. Crim. App. 1990) (stating that when statutory defense would negate the culpable mental state element and the defendant has raised evidence supporting the defense, the defendant is entitled to a jury instruction on the defense).

## 2. Was the error harmless?

Having determined that the trial court erred by denying Jenkins's requested instruction on mistake of law, we must now determine whether Jenkins suffered "some harm" as a result. *See Almanza*, 686 S.W.2d at 171. The record must show that Jenkins has suffered some actual, rather than merely theoretical, harm from jury instruction error. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). "Some" harm means the presence of any harm, regardless of degree, and cases involving preserved charge error will be affirmed only if no harm has occurred. *Id.* When determining whether some harm has occurred, we consider (1) the charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) other relevant factors present in the record. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Neither party has a burden to prove harm. *Id.*

41

Jenkins contends that the trial court's failure to include the requested instruction cannot be deemed harmless in this circumstance when the entirety of the defensive presentation was predicated on the statutory mistake of law defense. In response, the State contends that the trial court correctly concluded that Jenkins's defense was really challenging an element of the offense the State was required to prove, and therefore Jenkins actually received the charge he requested.

In particular, the State points out that the jury was given the definitions of "knowing" and "residence" (including its reference to the common law), and was told that it must acquit Jenkins if the State failed to prove "every element of the offense charged beyond a reasonable doubt." Moreover, the State asserts, the parties' arguments were made as if Jenkins had received a section 8.03 instruction, focusing on Jenkins's reliance on the election law authorities, whether his reliance was reasonable, and whether he believed that he had established residency. Finally, the State points to defense counsel's closing argument that "the State has failed to prove the most important element in this case and that's knowledge that the person knew that they weren't eligible to vote and they didn't reside in the district in which they weren't supposed to vote." Therefore, the State argues, the jury could not find Jenkins guilty without first determining that his reliance on the election law authorities was unreasonable.

Having considered the entirety of the record, we disagree with the State that Jenkins suffered no harm. As the court cogently explained in *Arroyo v. State*, mere jury argument cannot substitute for a charge that properly instructs the jury on the application of the law to the facts:

> An improper jury charge undercuts counsel's ability to argue effectively about the law of the case. Of course, [a defendant] can argue what is not expressly in the charge. *See State v. Renteria,* 977 S.W.2d 606, 608 (Tex. Crim. App. 1998). But, the

42

argument is without the authority of the court having pronounced what is the law. Lawyers can argue many things; they are advocates. They may, or may not, be accurate in what they say and they may or may not be believed. The trial court in this case instructed the jury that "the law of the case you will receive from the Court, which is given you herein, and [for you to] be governed thereby." The jury was not obligated to accept any of [the defendant's] statements or argument that could otherwise be construed to "make up" for, or "cure," the improperly omitted jury instruction. They were, however, obligated to accept the court's instructions. That's a big difference.

9 S.W.3d 330, 336 (Tex. App.—San Antonio 1999), *vacated*, 32 S.W.3d 868 (Tex. Crim. App. 2000) (per curiam). The jury in this case was similarly instructed that "the law you must be governed by[,] you shall receive in these written instructions, and you must be governed thereby." The trial court's refusal of the requested instruction prevented the jury from considering the statutory defense of mistake of law as part of the law of the case; therefore, we cannot say that Jenkins suffered no harm as a result.

By enacting Penal Code section 8.03, the legislature specifically recognized the affirmative defense of mistake of law as a narrow exception to the general rule that ignorance of the law is no excuse in situations in which an accused acts in reasonable reliance (even if mistaken) on certain official statements or written interpretations of the law. *See* Tex. Penal Code § 8.03. Jenkins's entire defense was based on his argument that he reasonably believed he was eligible to vote in the May 8, 2010 RUD election based on his reasonable reliance on the election law authorities, and he presented evidence supporting his defensive theory. Jenkins also timely requested an instruction on the statutory defense of mistake of law. It was for the jury to decide whether Jenkins unreasonably manipulated those authorities to provide cover for illegally voting in the election—which would be a crime; or whether Jenkins changed his residence and voted in the May 8, 2010

43

election based on a reasonable, but mistaken, reliance on the election law authorities—which would not be a crime. Jenkins's defense was not merely that he denied voting illegally, or that he acted in good faith, or that he was ignorant of the law. This is a situation in which the defensive theory has no context in the absence of the imprimatur of the court, contained in its charge, that a mistaken interpretation of law—when interpretation of law is an element of the offense and is disputed—might support a finding of not guilty.

We hold that the trial court erred by refusing to instruct the jury on Jenkins's requested statutory defense of mistake of law, and that this error caused Jenkins some harm. *See Almanza*, 686 S.W.2d at 171; *see also Hill v. State*, 765 S.W.2d 794, 797–98 (Tex. Crim. App. 1989) (holding that trial court's refusal to give appellant's requested charge on statutory defense raised by the evidence caused appellant some harm and was thus reversible error); *Jackson*, 646 S.W.2d at 227 (reversing and remanding case based on trial court's refusal to submit requested defensive issue of mistake of fact when evidence supported submission of the statutory defense). We therefore sustain Jenkins's first issue and reverse and remand the case for a new trial.

## CONCLUSION

We sustain Jenkins's first issue and do not reach the second. We reverse and remand the case for a new trial.

/s/     Ken Wise
        Justice

Panel consists of Justices Boyce, Busby, and Wise (Busby, J., dissenting).
Publish — TEX. R. APP. P. 47.2(b).



In The

# Fourteenth Court of Appeals

### NO. 14-13-00662-CR

**JAMES ALAN JENKINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Court Cause No. 12-03-02579-CR**

## DISSENTING OPINION

In this prosecution for illegal voting, appellant contends he was entitled to jury instructions allowing him to prove by a preponderance of the evidence that, due to a mistake of law, he reasonably believed he resided in the precinct in which he voted. But those are not the instructions appellant requested. Moreover, the charge given to the jury already required the State to prove beyond a reasonable doubt that appellant knew he did *not* reside in the precinct in which he voted. Because this charge gave the jury a more favorable vehicle to acquit the defendant if it agreed with his defensive theory, the trial court did not commit harmful error

in denying appellant's requested instructions. I would therefore overrule appellant's first issue and address his second issue challenging the statutory definition of residence used in illegal voting prosecutions as unconstitutionally vague. Because the majority sustains the first issue and does not reach the second, I respectfully dissent.

## I.   Background: the jury charge and appellant's requested instructions on mistake of law

Appellant was charged with "vot[ing] . . . in an election in which the person knows the person is not eligible to vote." Tex. Elec. Code Ann. § 64.012(a)(1) (West 2010). At trial, appellant admitted that he voted in an election for the Woodlands RUD Board of Directors. Appellant maintained, however, that he did not know he was ineligible to vote because he reasonably believed—in reliance on certain election law authorities—that his residence was a Residence Inn located within the territory of the RUD where he had stayed briefly. *See id.* § 11.001(a) (West 2010) (defining eligibility to vote as requiring residence in the territory covered by the election); *see also id.* § 1.015 (defining residence) (West 2010). Appellant requested that the trial court instruct the jury on the Penal Code's affirmative defense of mistake of law, which applies if a defendant proves by a preponderance of the evidence that "the actor reasonably believed the conduct charged did not constitute a crime and . . . acted in reasonable reliance upon" an official statement of the law or written interpretation of the law that meet certain requirements. Tex. Pen. Code Ann. § 8.03(b) (West 2011); *see also id.* § 2.04(d) (defining burden of proof on affirmative defense) (West 2011).

The trial court denied the requested instructions. The court explained that appellant's theory of the case actually challenged the State's ability to prove beyond a reasonable doubt the element of the crime that appellant knew he was ineligible to vote. Thus, the court reasoned, the jury would already have the issue

2

before it in a different fashion in the charge, and appellant would have a fair opportunity to argue the matter.

To determine whether the trial court committed error by denying the requested instructions and whether that error harmed appellant, it is useful to begin with the language of the jury charge and the requested instruction themselves. The charge provided, in pertinent part:

> A person commits the offense of illegal voting if he votes . . . in an election in which the person knows the person is not eligible to vote.
>
> . . . .
>
> To be eligible to vote in an election of this state, a person must . . . be a resident of the territory covered by the election for the office or measure on which the person desires to vote . . . .
>
> "Residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence. Residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the Texas Election Code. . . .
>
> . . .
>
> Now if you find from the evidence *beyond a reasonable doubt* that . . . [the defendant did] vote in an election . . . when the defendant *knew he was not eligible to vote because he knew he did not reside in the precinct in which he voted*, then you will find the defendant guilty of voting illegally as charged in the indictment.

(Emphasis added). Appellant's requested instructions provided, in pertinent part:

> If you all agree the state has proved, beyond a reasonable doubt, each of the elements listed above, you must next consider whether the defense of mistake of law applies.
>
> You have heard evidence that, when the defendant committed the act of illegal voting, he believed that his conduct did not constitute a crime.
>
> A person's conduct that would otherwise constitute the crime of

3

illegal voting is not a criminal offense if the person *reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime* and that he acted in reasonable reliance on [an official statement or written interpretation of the law meeting certain requirements].

. . .

To decide the issue of mistake of law, you must determine whether the defendant has proved, *by a preponderance of the evidence*, the following three elements:

1. The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

2. The defendant's belief was reasonable; and

3. The defendant reached his belief in a reasonable reliance on [an official statement or written interpretation of the law meeting certain requirements].

(Emphasis added).

## II. Mistake of law can be either a defense of confession and avoidance or a defense that negates an element of the offense.

The majority first addresses the State's argument that the trial court did not err in denying these instructions because mistake of law is a defense of confession and avoidance, and appellant did not essentially admit to every element of the offense as required to claim such a defense. A defense of confession and avoidance is one that, by definition, does not negate an element of the charged offense; rather, it excuses what would otherwise constitute criminal conduct. *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007). An instruction on such a defense is appropriate only when defendant essentially admits to every element of the offense. *Juarez v. State*, 308 S.W.3d 398, 401 (Tex. Crim. App. 2010).

The majority rejects the State's argument by holding that the defense of mistake of law "may be applied to negate the culpable mental state of an alleged

4

offense when an accused contends that he reasonably believed his conduct was not criminal based on his reasonable reliance on official statements or interpretations of the law." *Ante*, at 33. Therefore, the majority holds, "the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine" requiring appellant to admit the elements of the offense before he can obtain an instruction on the defense. *Id.* Although I agree that the defensive theory of mistake argued by appellant would negate the culpable mental state of the particular offense in question, it is important to recognize that mistake of law can be a defense of confession and avoidance. Indeed, as explained in Part III.A. below, appellant's own requested instructions show that he asked the trial court to submit the defense as one of confession and avoidance.

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system," *Cheek v. United States*, 498 U.S. 192, 199 (1991), and it is recognized in our Penal Code. *See* Tex. Penal Code Ann. § 8.03(a) (West 2011). There are two different kinds of mistakes of law, however, that do provide a defense: (1) a mistake that negates the mental state required to prove the particular offense in question; and (2) a reasonable belief, in reliance on certain official statements, that conduct undertaken with that required mental state does not violate the criminal law. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.6(a), at 394–97 (2d ed. 2003).[1] Although the first kind of mistake negates an element of the offense, the second kind is a defense of confession and avoidance under Texas law.

Regarding the first kind, "[i]nstead of speaking of ignorance or mistake of . . . law as a defense, it would be just as easy to note simply that a defendant cannot be convicted when it is shown that he does not have the mental state required by

---

[1] *See also United States v. Platte*, 401 F.3d 1176, 1184 (10th Cir. 2005); *State v. Steele*, 236 P.3d 161, 171 (Utah App. 2010).

5

law for the commission of that particular offense." *Id.* at 395. When a legal mistake negates the specific intent required for the crime in question, some courts refer to the defense as one of "good faith" mistake, though the mistake may not need to be a reasonable one to negate the required mental state. *See, e.g., Cheek,* 498 U.S. at 200–03 (holding defendant's belief need not be objectively reasonable to negate willful mental state required for criminal tax evasion).

As to the second kind of mistake, Texas—like some other states—has created a statutory exception that allows mistake of law to serve as a defense if the defendant reasonably believed the conduct charged did not constitute a crime and acted in reasonable reliance upon an official statement or written interpretation of the law meeting certain requirements. Tex. Penal Code Ann. § 8.03(b). Because the conduct charged includes the accompanying mental state, *see id.* § 1.07(a)(10) (West 2011), this defense applies even when the defendant's mistake would not negate the culpable mental state for the particular crime charged.

For example, in addressing a charge of intentionally and knowingly possessing a firearm and body armor, our sister court recognized that a defendant's reasonable belief that he was entitled to a police officer exception would involve a mistake of law even though it would not negate the culpable mental state of intentional and knowing possession. *Plummer v. State,* 426 S.W.3d 122, 127 (Tex. App.—Houston [1st Dist.] 2012), *aff'd as reformed on other grounds,* 410 S.W.3d 855 (Tex. Crim. App. 2013). Similarly, courts in other states have held that a defendant could assert this type of statutory mistake defense even when he acted with the culpable mental state of the crime charged. *See State v. Sheedy,* 480 A.2d 887, 888–89 (N.H. 1984) (holding defendant charged with willfully intercepting telephone conversations entitled to present defense that he believed in reliance on letter from public utility commission that his conduct was not governed by state law); *People v. Studifin,* 504 N.Y.S.2d 608, 611–12 (N.Y. Sup. Ct. 1986) (holding

6

defendant charged with knowingly possessing weapon not guilty given evidence that he believed possession was not offense based on official statement that license was required to sell weapon).[2]

As these cases show, reasonable reliance on official statements will not necessarily negate any culpable mental state applicable to a charged offense. Rather, this kind of statutory mistake of law may also provide a defense when it does not negate the culpable mental state. In these circumstances, it is a defense of confession and avoidance.

Moreover, the difference between these two kinds of mistakes has significant implications for the question whether denying an instruction on mistake of law is harmful error—implications that the majority does not address. When the mistake would negate the culpable mental state of the crime, a jury charge that simply lays out the crime's elements already provides the jury with a vehicle to give effect to the defense by finding that the State failed to prove the mental state beyond a reasonable doubt. But when there is evidence of a reasonable mistake that does not negate the culpable mental state, there is no way for the jury to give effect to that evidence unless it is instructed that the mistake provides a defense if the requirements of section 8.03 of the Penal Code are met. *See Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013). For all of these reasons, we must determine which kind of mistake appellant is asserting here.

Applying this two-part understanding of mistake of law, I agree with the majority's conclusion that the particular mistake appellant claims here is the first

_____

[2] Federal courts and some courts in states with no comparable statute recognize a variant of this exception under principles of due process. *See Commonwealth v. Kratsas*, 764 A.2d 20, 27–33 (Pa. 2001). This due process-based mistake defense likewise applies even if the defendant acted with the culpable mental state of the crime charged. *See Miller v. Commonwealth*, 492 S.E.2d 482, 487–491 (Va. App. 1997) (dismissing charge of knowing and intentional possession of firearm by felon because defendant reasonably relied on advice of probation officer that possession was lawful).

kind of mistake—one that negates the culpable mental state of the crime of illegal voting. As the majority succinctly explains, appellant "did not deny registering to vote and voting in the RUD election, but he disputed that at the time he cast his vote he acted 'knowingly,' i.e."—in the language of the jury charge—"that he 'knew he was not eligible to vote because he knew he did not reside' in the RUD." *Ante*, at 35. Indeed, "a jury could not conclude that [appellant] 'knew he did not reside in the [RUD]' and also conclude, based on mistake of law, that [appellant] 'reasonably believed' that he did not commit a crime by voting in the election based on his 'reasonable reliance' on the election law authorities." *Ante*, at 32.

## III. Because the claimed mistake would negate an element of the offense, denying the requested instructions was not error and did not harm appellant.

Having held that appellant's claimed mistake of law would negate the culpable mental state on which the jury was instructed, it follows that the trial court's denial of appellant's request for separate instructions on that mistake was not error and did not harm appellant. To explain the basis for these conclusions, I examine appellant's arguments regarding error and harm in turn. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (explaining two-step process for reviewing complaint of criminal jury charge error).

### A. Error

Appellant argues that the trial court erred in denying instructions on the affirmative defense of mistake of law because he offered some evidence that he reasonably relied on the election law authorities to form a reasonable belief that he was a resident, for voting purposes, of the precinct in which he voted. To be sure, the Court of Criminal Appeals has held that a trial court must instruct the jury on statutory affirmative defenses whenever they are raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 & n.17 (Tex. Crim. App. 2007). But it has also

8

held that when a defense is one of confession and avoidance, "defensive evidence [that] merely negates the necessary culpable mental state . . . will not suffice to entitle the defendant to a defensive instruction." *Shaw*, 243 S.W.3d at 659; *see also Cornet*, 417 S.W.3d at 451; *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013). As explained above, the kind of mistake of law that Texas has recognized by statute is a defense of confession and avoidance.

There are no Texas decisions addressing which of these principles should control when a defendant requests a defensive instruction regarding a mistake of law that would negate the culpable mental state of the offense. The federal courts have addressed such requests, however, and most have concluded that the defendant is not entitled to such an instruction. For example, in criminal fraud cases, most circuits have held that an instruction regarding a defendant's good-faith belief that he was following the law is redundant because such a belief is incompatible with the required specific intent to deceive. *See, e.g., Green v. United States*, 474 U.S. 925 (1985) (White, J., dissenting from denial of certiorari and noting circuit split in which Second and D.C. Circuits, among others, hold that defendant is not entitled to separate good-faith instruction); *United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) (comparing decisions of the First, Fourth, Fifth, Eighth, and Eleventh Circuits, which do not require good-faith instruction, with decisions of the Tenth Circuit, which does); *see also United States v. Pomponio*, 429 U.S. 10, 13 (1976) (per curiam) (holding in tax fraud prosecution that "The trial judge . . . adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary."); *United States v. Kokenis*, 662 F.3d 919, 930 (7th Cir. 2011) (same); *United States v. Simkanin*, 420 F.3d 397, 409–412 (5th Cir. 2003) (same).

In particular, the Fifth Circuit has changed its mind on this issue. Although it held in some early cases that the district court abused its discretion in omitting a

9

good-faith instruction despite the inclusion of instructions defining the required mental state, its recent cases hold that there is no abuse of discretion if the defendant is able to present his good-faith defense through witnesses, closing arguments, and other jury instructions. *United States v. Hunt*, 794 F.2d 1095, 1098 (5th Cir. 1986); *see also United States v. Frame*, 236 Fed. Appx. 15, 18 & n.5 (5th Cir. 2007).

Of course, Texas courts analyzing this issue must also take into account that mistake of law is a statutory affirmative defense. *See Walters*, 247 S.W.3d at 209–10. Texas courts analyzing the statutory defense of mistake of fact—which explicitly negates the culpable mental state of the offense—have reached conflicting conclusions about whether omitting an instruction on that defense is error. *See Okonkwo v. State*, 398 S.W.3d 689, 695–96 & nn.5–6 (Tex. Crim. App. 2013).[3] As Judge Womack has explained, the root of this disagreement is that the defense of mistake of fact sits

> astride two principles in the law of the jury charge. While it is true that a defendant is entitled to an affirmative submission of a defensive issue, it is likewise true that no affirmative charge need be given when a defensive theory merely negates an element of the offense. . . . Had the Legislature not codified the defense of mistake of fact, we might be free to say that the jury charge could, and should, handle the issue adequately by requiring the jury to find the element of the culpable mental state in order to convict.

*Posey v. State*, 966 S.W.2d 57, 70 (Tex. Crim. App. 1998) (Womack, J., concurring).

In *Bruno v. State*, a plurality of three judges of the Court of Criminal Appeals concluded that an instruction on mistake of fact was unnecessary in a prosecution for unauthorized use of a motor vehicle. 845 S.W.2d 910, 913 (Tex.

---

[3] This issue also has divided courts in other states. *See, e.g., State v. Locquiao*, 58 P.3d 1242, 1253–55 (Haw. 2002) (collecting cases).

Crim. App. 1993) (plurality op. of White, J.). There, the appellant testified that the owner gave him her car, but the owner testified that the appellant grabbed her keys and drove away. The charge required the jury to find that the appellant intentionally or knowingly operated the vehicle without the owner's effective consent. The plurality explained that a mistake instruction need not have been given because "the jury could not believe both the testimony of [the] owner and the testimony of appellant," and the jury "would have necessarily been required to disbelieve appellant's story before they could find sufficient evidence to convict." *Id.* Three other judges concurred, agreeing that "the mistake of fact instruction[] was unnecessary in the instant case." *Id.* (Baird, J., concurring). This Court followed *Bruno* in a non-precedential opinion, *Hopson v. State*, No. 14-08-735-CR, 2009 WL 1124389 (Tex. App.—Houston [14th Dist.] Apr. 28, 2009, no pet.) (mem. op., not designated for publication),[4] as did the Beaumont Court of Appeals in *Traylor v. State*, 43 S.W.3d 725, 730–31 (Tex. App.—Beaumont 2001, no pet.).

On the other hand, the Court of Criminal Appeals has said that when a defendant's evidence "creates an issue of mistaken belief as to only the culpable mental state element of theft . . . , the defendant would be entitled to a defensive instruction of 'mistake of fact.'" *Willis v. State*, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990); *see also Giesberg v. State*, 984 S.W.2d 245, 249–50 (Tex. Crim. App. 1998).

It is unnecessary to resolve this disagreement here because mistake of law—unlike mistake of fact—is a statutory affirmative defense that the defendant has the burden to prove, and the kind of mistake of law addressed by the statute is a defense of confession and avoidance. Critically, appellant's own requested

---

[4] In a later opinion, which has been reversed, this Court distinguished *Bruno* but opined in dicta that *Bruno*'s discussion of this issue was itself dicta. *See Okonkwo v. State*, 357 S.W.3d 815, 820–21 (Tex. App.—Houston [14th Dist.] 2011), *rev'd*, 398 S.W.3d 689 (Tex. Crim. App. 2013).

instructions would have submitted the defense as one of confession and avoidance. The requested instructions focused on whether appellant "reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime." The jury charge described the conduct charged in this case, in part, as voting when appellant "knew he did not reside in the precinct in which he voted." *See* Tex. Penal Code § 1.07(a)(10) (defining "conduct" as "an act or omission and the accompanying mental state"). Thus, appellant's requested instructions would have asked the jury to decide whether appellant reasonably believed it was not a crime for him to vote when he *knew* he did not reside in the precinct in which he voted. This instruction is not supported by the defensive evidence that appellant contends negates the culpable mental state: that he reasonably believed he resided at the Residence Inn under the election law authorities, and therefore he did *not* vote in a precinct knowing he did not reside there.[5] Because appellant's requested defensive instructions do not negate an element of the charged offense, but rather excuse what would otherwise constitute criminal conduct, they are subject to the confession and avoidance doctrine.

As the Court of Criminal Appeals has repeatedly held, "[w]hen the defensive evidence does no more than negate an element of the offense, a defendant is not entitled to an instruction on any defense subject to the confession-and-avoidance doctrine." *Cornet*, 417 S.W.3d at 451; *see also Villa*, 417 S.W.3d at 462; *Shaw*, 243 S.W.3d at 659. Applying this rule to the affirmative defense of mistake of law appropriately takes all of the Legislature's choices into account, especially given the different burdens involved in proving an offense and an affirmative defense. *See* Tex. Penal Code Ann. §§ 2.01, 2.04(d) (West 2011). Requiring courts to

---

[5] Appellant's requested instructions appear to be based on the recommended pattern defensive instruction on mistake of law. The drafting committee notes in its introduction that the recommended instruction does not address a situation in which the mistake tends to show the defendant lacked the required culpable mental state. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Defenses* § B12.2, at 162 (2013).

instruct that a defendant may prove mistake of law by a preponderance of the evidence respects the Legislature's decision to codify that affirmative defense, while omitting such an instruction when the evidence of mistake would do no more than negate an element of the offense respects the Legislature's requirement that the State prove that element beyond a reasonable doubt.

As explained above, appellant's evidence of mistake would do no more than negate an element of the illegal voting offense. "[A] jury could not conclude that [appellant] 'knew he did not reside in the [RUD]' and also conclude, based on mistake of law, that [appellant] 'reasonably believed' that he did not commit a crime by voting in the election based on his 'reasonable reliance' on the election law authorities." *Ante*, at 32. Moreover, appellant did not support the instructions he actually requested with evidence that he reasonably believed he did not commit a crime even though he voted knowing he did not reside in the RUD. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) (holding "there must be at least some evidence to support the defense" before the trial court is required to give the requested instruction). Accordingly, appellant was not entitled to the mistake instructions under *Cornet* and *Krajcovic*, and the trial court did not err in denying them.

## B.    Harm

Even if the trial court did err in denying appellant's requested instructions, a proper harm analysis reveals that appellant was not harmed by that error. When the charge contains error and that error has been properly preserved by an objection or request for instruction,[6] reversal is required if the error is "calculated to injure the rights of the defendant." *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003). The trial record must demonstrate that there is some actual

---

[6] For purposes of the harm analysis, I assume without deciding that the majority is correct that Jenkins preserved his complaint. *Ante*, at 25 n.9.

harm, not just a theoretical complaint. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012). In assessing "the actual degree of harm," we consider the whole record, including "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

In *Cornet*, a case involving the omission of a medical-care defensive instruction, the Court of Criminal Appeals held the omission was harmless error. 417 S.W.3d at 453. It observed that the omission of an instruction on a confession-and-avoidance defense "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Id.* at 451. Nevertheless, the court conducted a record-specific analysis of harm and held that the jury implicitly rejected the defendant's defense when it convicted him of a second offense involving the same event that was inconsistent with his claim of providing medical care. *Id.* at 452.

Here, appellant argues (notwithstanding the language of his requested instructions) that his defensive theory of mistake of law sought to negate the culpable mental state of illegal voting by proving that he reasonably believed he resided in the precinct in which he voted. But the mental state of "kn[owing] he did not reside in the precinct in which he voted" was already included in the jury charge, providing the jury with a vehicle to give effect to appellant's defense by finding that the State failed to prove the mental state beyond a reasonable doubt. Appellant was allowed to introduce evidence to support his defense. Because the jury would have to reject appellant's defensive evidence in order to convict him of knowing he did not reside in the precinct in which he voted, the charge and the state of the evidence indicate that any error in failing to instruct the jury on mistake of law was not harmful. *See Druery v. State*, 225 S.W.3d 491, 505 (Tex. Crim.

14

App. 2007) ("As we have stated, when a refused charge is adequately covered by the charge given, no harm is shown.").

Many courts have reached a similar conclusion regarding the lack of harm from failing to instruct on a defense of mistake of fact that would negate the culpable mental state. *See Reyes v. State*, 422 S.W.3d 18, 31–32 (Tex. App.—Waco 2013, pet. ref'd) (holding "mistake-of-fact instruction was not essential because the factfinder would necessarily have had to reject Reyes's defense to convict Reyes of the elements of the crime as a principal" and that "Reyes was not harmed by the failure to have his requested instruction on the mistake of fact defense submitted to the jury"); *Durden v. State*, 290 S.W.3d 413, 421 (Tex. App.—Texarkana 2009, no pet.) ("While in some instances the denial of a proper defensive instruction would cause harm by preventing the defendant from arguing an issue, i.e., self-defense, here, Durden fully argued that he thought the wire was abandoned and that he had no intent to deprive the owner of the property . . . . While the trial court did err by denying the mistake-of-fact instruction, the jury's verdict inferentially resolved the issue that would have otherwise been required via the requested instruction. It would require us to resort to mere conjecture to conclude, on this evidentiary record, that Durden suffered any actual harm."); *Sands v. State*, 64 S.W.3d 488, 496 (Tex. App.—Texarkana 2001, no pet.); *see also Posey*, 966 S.W.2d at 70–71 (Womack, J., concurring) (observing that although the power to create defenses belongs to the Legislature, "the close relationship between the defense of mistake of fact and the culpability element of the offense is important in the consideration of the harmfulness of the omission of an instruction on the defense," and concluding that charge on culpable mental state allowed jury to "give effect to the defense of mistake of fact").

This conclusion of harmlessness applies even more strongly to the defense of mistake of law because appellant's defensive theory was less favorable to him

15

than the jury charge he received. The jury charge required the State to prove beyond a reasonable doubt appellant's knowledge that he did not reside in the precinct in which he voted, while appellant's theory would have required him to prove by a preponderance of the evidence that he reasonably believed he did reside in that precinct. *Cf. Giesberg*, 984 S.W.2d at 250 ("A defensive issue which goes no further than to merely negate an element of the offense alleged . . . does not place a burden of proof upon a defendant to establish it."). Given that the jury could not find both knowing non-residence and reasonable belief of residence, including both standards in the charge with different burdens would, at the very least, have confused the jury. *See Lowry v. State*, 671 S.W.2d 601, 603 (Tex. App.—Dallas 1984) ("[W]hen the affirmative defense requires a negation of an element of the crime, there seems to be an insoluble conflict for the jury due to the existence of simultaneous burdens of proof. In other words, the jury may become confused by the different burdens of proof and inadvertently fail to accord due consideration to evidential matters relating to the affirmative defense.") (citing Comment, *Affirmative Defenses Under the New York New Penal Law*, 19 Syracuse L. Rev. 44, 47 (1967)), *aff'd in relevant part*, 692 S.W.2d 86 (Tex. Crim. App. 1985). Indeed, if the State had requested and received a mistake of law instruction, appellant would surely be arguing on appeal that the instruction unconstitutionally shifted the burden to him of disproving an element of the offense. *See* 692 S.W.2d at 87–88 (affirming portion of court of appeals' decision holding that statute violated due process by labeling element of offense as an "affirmative defense" and shifting burden to defendant to disprove it).

Moreover, the charge required the State to prove actual knowledge of non-residency, while appellant's defensive theory would have required the jury to decide whether appellant's belief regarding residency was reasonable. "This would have been problematic for appellant because the instruction[s] would have

16

decreased the State's burden of proof by permitting the jury to convict him if it concluded that his mistake was unreasonable, even if it found that the belief was honest." *Okonkwo*, 398 S.W.3d at 696; *see id.* at 702 (Cochran, J., concurring).[7] The observation of Professors Dix and Schmolesky in the related context of mistake of fact is equally apt here: "in light of the fact that [the requested instruction] is duplicative of other mandatory instructions and is harmful to the defense, it is difficult to imagine that an erroneous refusal to grant a [request] for a charge concerning the defense would ever fail to be harmless." 43 George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice and Procedure* § 43:36, at 917 (3d ed. 2011).

The majority contends that harm is shown because appellant's defensive theory had "no context in the absence of the imprimatur of the court, contained in its charge, that a mistaken interpretation of law—when interpretation of law is an element of the offense and is disputed—might support a finding of not guilty." *Ante*, at 44. To the contrary, the record as a whole reveals that the charge (quoted above) included as an element of the offense the culpable mental state of knowledge that appellant did not reside in the precinct in which he voted, and appellant's counsel was able to argue that the State failed to prove this element because appellant thought he resided in the precinct and was eligible to vote there under the election law authorities.

In sum, because the jury could not find both that appellant knew he was not a resident but had a reasonable belief he was a resident, the knowing requirement in the charge fulfills the same function as the reasonable belief defense: giving the

---

[7] In some other states, the State—not the defendant—has been the party relying on the mistake of law defense to suggest that the mistake must be reasonable in order to negate the culpable mental state for the crime. *E.g.*, *Steele*, 236 P.3d at 170–72 (noting but not resolving argument); *State v. Jacobson*, 697 N.W.2d 610, 615–16 (Minn. 2005) (rejecting State's argument).

jury a vehicle to find appellant not guilty if he thought he was a resident in reliance on the authorities. Indeed, the charge as given was better for appellant because it placed the burden on the State and did not require reasonableness. Accordingly, I would hold that any error in failing to charge the jury separately on appellant's defensive theory of mistake of law was harmless. Because the majority instead holds that this failure was harmful error requiring a new trial, I respectfully dissent.


/s/    J. Brett Busby
        Justice


Panel consists of Justices Boyce, Busby, and Wise (Wise, J., majority).
Publish — TEX. R. APP. P. 47.2(b).

18



# JUDGMENT

## The Fourteenth Court of Appeals

JAMES ALAN JENKINS, Appellant

NO. 14-13-00662-CR        V.

THE STATE OF TEXAS, Appellee

---

This cause was heard on the transcript of the record of the court below. The record reveals error in the judgment. The Court orders the judgment **REVERSED** and **REMANDED** for further proceedings in accordance with its opinion.

We order THE STATE OF TEXAS to pay all costs incurred in this appeal.

We further order this decision certified below for observance.